1

2

3

4

5

6

7

8

9                          UNITED STATES DISTRICT COURT

10                      FOR THE EASTERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| ROBERT MARTINEZ, an individual, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KNIGHT TRANSPORTATION, INC. dba ARIZONA KNIGHT TRANSPORTATION, INC.,<br><br>Defendant. | No.  1:16-cv-01730-SKO<br><br>**ORDER DENYING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>(Doc. 70.) |

This matter is before the court on Plaintiff's motion for preliminary approval of a class action settlement and conditional certification of settlement class filed on November 10, 2021. (Doc. 70.)  Pursuant to General Order No. 617 addressing the public health emergency posed by the COVID-19 pandemic, Plaintiff's motion was taken under submission on the papers.  (Doc. 71.) On September 23, 2022, the parties consented to the jurisdiction of the U.S. Magistrate Judge and the case was reassigned to the undersigned.  (*See* Docs. 76–78.)

For the reasons explained below, the Court denies preliminary approval of the proposed class action settlement without prejudice.

# I.   BACKGROUND

Plaintiff and the putative class members were employed as truck drivers by Defendant. (Doc. No. 2-1 at 13.)  Their job responsibilities included making deliveries of dry goods, produce, materials, and other products to various businesses located throughout California.  (*Id.* at 13.)

Plaintiff and the putative class members allege that they typically worked between 10 and 14 hours per day, 5 to 6 days per week, and 52 weeks per year.  (*Id.*)  According to the allegations of the complaint, Defendant failed to provide class members with appropriate meal and rest breaks as required under California law.  (*Id.* at 13–14.)  Moreover, although the class members were compensated based on a piece-rate formula, Defendant did not pay them a separate hourly wage to compensate them for rest breaks and for performing non-driving tasks.  (*Id.* at 13.)

Based on these allegations, Plaintiff originally filed his class action complaint in the Tulare County Superior Court on September 30, 2016.  (Doc. 2-1 at 8.)  Plaintiff's complaint asserts wage, hour, and other labor-related claims in violation of the California Labor Code and California Business and Professions Code, which Plaintiff alleges give rise to penalties under California's Private Attorney's General Act ("PAGA").  (*Id*. at 18–26.)  Defendant answered the complaint on November 10, 2016 (Doc. 2-1 at 30–40), and removed the case to this Court on diversity grounds under the Class Action Fairness Act ("CAFA"), 28 U.S.C § 1332(d), on November 14, 2016 (Doc. 2 at 2).  On March 21, 2017, Defendant filed a motion to change venue seeking transfer of the action to the District of Arizona pursuant to 28 U.S.C. § 1404(a).  (Doc. 8.)  The motion was denied on June 23, 2017.  (Doc. 19.)

The parties then "engaged in an exchange of formal discovery," including the deposition of Defendant's Fed. Civ. P. 30(b)(6) designee.  (Doc. 70 at 9.)  Defendant produced documents, including its written meal and rest period policies and other policies applicable to its truck drivers, "sample trip sheets," "Movement display data from the trucks' onboard computer systems," a sample "trip dispatch report," and a putative class list.  (*Id*.)

On March 2, 2018, Plaintiff filed a motion to certify the class (Doc. 25), which was granted on December 3, 2018 (Doc. 35).  The Court certified the following class:

All current and former truck drivers employed by defendant Knight Transportation, Inc., who advised defendant that they resided in Oregon, Nevada, Arizona, Utah, and/or Colorado, who were paid in whole or in part on a piece-rate basis, and who drove one or more routes of five hours or more entirely within the State of California for defendant during the "Class Period" from September 30, 2012 through [December 3, 2018].

(Doc. 35 at 19 (the "Class").)  The Class was certified as to the following causes of action:

1.      Plaintiff's first cause of action for Defendant's failure to provide duty-free meal breaks and pay missed meal break premium in violation of Labor Code § 512 and 226.7 and Wage Order No. 9-2001, § 11 (challenging Defendant's uniform cargo security policy that drivers had to watch their trucks at all times, even while eating);

2.      Plaintiff's second cause of action for Defendant's failure to pay Class members separately and hourly for time spent on inspections and detention time in California in violation of Labor Code §§ 1194 and 226.2 (challenging Defendant's uniform compensation policy that paid its non-resident drivers for routes that began and ended in California on a "per mile" basis with some additional hourly pay for detention time over two hours, but no separate and hourly pay for inspection and detention time);

3.      Plaintiff's third cause of action for Defendant's failure to provide the Class with paid rest breaks and pay rest break premiums for unpaid rest breaks of Class members on their California routes in violation of Labor Code § 226.7 and Wage Order No. 9-2001, § 12(A)-(B) (challenging Defendant's uniform compensation and rest break policy and practice failed to provide separate and hourly pay for Class members' rest periods on their routes that began and ended in California); and

4.      Plaintiff's sixth cause of action for Defendant's unfair business practices, in violation of Business and Professions Code §§ 17200 et seq. (the "UCL"), based entirely on the foregoing violations, all of which occurred 100% within the State of California.

(Doc. 35 at 2; *see also* Doc. 2-1 at 18–26.)[1]

In December 2018, the Federal Motor Carrier Safety Administration ("FMCSA") issued a "determination" preempting California's meal and rest break laws for drivers subject to certain federal regulations, and four petitions for review challenging the FMCSA determination were subsequently filed before the Ninth Circuit.  (Doc. 70-1 at ¶ 12.)  Anticipating that the Ninth

---

[1] Plaintiff did not pursue certification of his fourth and fifth causes of action, waiting time and wage statement penalty claims, respectively.  (*See* Doc. 70-1 at 13 n.8.)

1   Circuit's decision could impact some of the claims in this case, the parties stipulated to stay this

2   matter until the Ninth Circuit issued its decision.  (Docs. 51 & 52.)  In January 2021, the Ninth

3   Circuit panel denied the petitions for review of the FMCSA's determination and held that the

4   determination merits deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,*

5   *Inc.*, 467 U.S. 837 (1984).  (*See* Doc. 70-1 at ¶ 12.)  The Ninth Circuit panel in *IBT v. FMCSA*

6   declined to consider whether the FMCSA's determination applies retroactively.  (*See id.*)

7   Accordingly, the Court lifted the stay on March 20, 2021.  (Doc. 60.)  The parties agree that the

8   prospective versus retroactive applicability of the Ninth Circuit decision in *IBT v. FMCSA* remains

9   a disputed legal issue, although most courts—all except one—have adopted Defendant's position

10  that the FMCSA's determination applies retroactively.  (*See* Doc. 70-1 at ¶ 12; *see also* Doc. 70 at

11  21–23.)

12          Following the lifting of the stay, the parties agreed to participate in private mediation and

13  an exchange of additional informal discovery and information.  (Doc. 70 at 11.)  Among other data

14  and information, Defendant provided information regarding the number of Class members and

15  workweeks during the Class period.  (*Id.*)  In June 2021, the parties attended an all-day mediation

16  before Mark S. Rudy, who Plaintiff's counsel describes as a "well-respected wage and hour

17  mediator."  (Doc. 70-1 at ¶ 13.)  The parties were unable to reach a resolution on the date of

18  mediation.  (Doc. 70 at 11.)  However, the parties were given a mediator's proposal and continued

19  settlement discussions "over the following months" with continued input from the mediator.  (*Id.*)

20  "[A]fter extensive arms' length negotiations," and with the assistance of the mediator, the parties

21  were ultimately able to reach a settlement in principle in September 2021 and ultimately executed

22  a "Stipulation of Class and PAGA Representative Action Settlement and Release" (the "Settlement

23  Agreement").  (*See id.*; *see also* Doc. 70-2.)

24          On November 10, 2021, Plaintiff filed the pending unopposed motion for preliminary

25  approval of the class action settlement.[2]  (Doc. 70.)

26  ///

27

28  _____

[2] On September 23, 2022, the parties consented to the jurisdiction of the U.S. Magistrate Judge, whereupon the motion was reassigned to the undersigned.  (*See* Docs. 76–78.)

1

**II.       THE PROPOSED SETTLEMENT**

2

**A.       The Class**

3

For settlement purposes, the parties request approval of the following class (the "Class") of

4

an estimated 5,500 individuals (the "Settlement Class" or "Settlement Class Members"): "all

5

current and former truck drivers employed by defendant Knight Transportation, Inc., who advised

6

defendant that they resided in Oregon, Nevada, Arizona, Utah, and/or Colorado, who were paid in

7

whole or in part on a piece-rate basis, and who drove one or more routes of five hours or more

8

entirely within the State of California for defendant during the 'Class Period' from September 30,

9

2012 through [p]reliminary [a]pproval" of the settlement.  (Doc. 70 at 7; Doc. 70-2 at 5–6.)

10

**B.       PAGA Claim Members**

11

Plaintiff has defined "PAGA Claim Members" as "any and all Class Members, who worked

12

for Defendant at any time from September 27, 2015 up to preliminary approval" of the settlement.

13

(Doc. 70-2 at 6.)  Twenty-five percent of the civil PAGA penalties will be paid to the PAGA Claim

14

Members as part of their PAGA payment share, as described below.  (*Id*. at 9.)

15

**C.       The Settlement Period**

16

For settlement purposes, the parties have defined the "Class Period" as the time period from

17

"September 30, 2012 through [p]reliminary [a]pproval" of the settlement.  (Doc. 70-2 at 6.)  By

18

contrast, the relevant period for the PAGA claims is September 27, 2015, through preliminary

19

approval.  (*Id*.)

20

**D.       The Release of Claims**

21

The Settlement Agreement defines the Released Parties as "(a) all of Knight's present and

22

former parent companies, subsidiaries, related or affiliated companies (including but not limited to

23

Knight-Swift Transportation Holdings, Inc. and Knight Truck and Trailer Sales LLC); (b) Knight's

24

divisions, and (c) the present and former officers, directors, members, managers, shareholders,

25

agents, insurers, administrators, fiduciaries, trustees, operators, partners, joint ventures,

26

franchisees, franchisors, consultants, contractors, attorneys, successors or assignees."  (Doc. 70-2

27

at 22.)  The Released Claims are defined as:

28

5

claims, debts, liabilities, demands, obligations, guarantees, costs, expenses, interest, attorneys' fees, damages, action or causes of action under state including: (1) failure to provide timely duty-free meal periods in violation of California Labor Code sections 512, 516, 226.7 and Section 11 of IWC Wage Order No. 9; (2) failure to pay separately and hourly for non-driving time and rest breaks in violation of California Labor Code sections 1194, 1194.2 and 226.2; (3) failure to authorize and permit paid rest breaks and pay missed rest break premiums in violation of California Labor Code sections 226.7, 516 and Section 12 of IWC Wage Order No. 12); (4) failure to timely furnish accurate itemized wage statements in violation of Labor Code sections 226, 226.2, and Section 5 of IWC Wage Order No. 9-2001; (5) failure to pay wages upon separation in violation of California Labor Code sections 201-203); (6) unfair competition for all possible claims listed above under California Business and Professions Code sections 17200 et. seq. and (7) a PAGA cause of action for all possible claims listed above and all other civil penalty claims under California Labor Code sections 226.3, 226.7, 512, 558, 1174, 1174.5 (California Labor Code section 2698, et al.)  []  The release of the foregoing claims and definition of Released Claims, extends to all theories of relief regardless of whether the claim is, was or could have been alleged as separate claims, causes of action, lawsuits or based on other theories of relief, whether under California law, federal law, any state law or common law (including, without limitation, as violations of the California Labor Code, the Wage Orders, applicable regulations, California's Business and Professions Code section 17200), any and all claim [sic] under the Fair Labor Standards Act based on the factual allegations in the Complaint and any benefits under any benefit plan, program or policy sponsored or maintained by the Company, including, but not limited to the Employee Retirement Income Security Act, 29 U.S.C. §1001, et seq., but not vested benefits under any pension or 401(k) plan or other ERISA-governed benefit plan.  "Released Claims" includes all types of relief available for the above-referenced claims, including any claims for damages, restitution, losses, penalties, fines, liens, attorneys' fees, costs, expenses, debts, interest, injunctive relief, declaratory relief, or liquidated damages. In addition, each member of the Class who does not submit a valid request for exclusion forever agrees that he or she will not institute any action, nor accept back liquidated damages, punitive damages, penalties of any nature (other than the PAGA Released Claims), attorneys' fees and costs, or any other relief from any other suit, class or collective action, administrative claim or other claim of any sort or nature whatsoever against Knight, for the Settlement Class Period for the claims being released herein.

(Doc. 70-2 at 23.)  The Settlement Agreement provides, upon final approval of the settlement, "Plaintiff, on his own behalf and as the Class Representative, all members of the Settlement Class and all persons purporting to act on their behalf or purporting to assert a claim under or through them, including, but not limited to, their dependents, heirs and assigns, beneficiaries, devisees, legatees, executors, administrators, trustees, conservators, guardians, personal representatives, and

6

1  successors-in-interest . . . fully release and discharge Released Parties from any and all Released

2  Claims arising during the Class Period."  (*Id*. at 22.)

3       The Settlement Agreement also provides for the release of PAGA claims, in which

4  "Plaintiff, on his own behalf and all PAGA Claim Members and all persons purporting to act on

5  their behalf or purporting to assert a claim under or through them, including, but not limited to,

6  their dependents, heirs and assigns, beneficiaries, devisees, legatees, executors, administrators,

7  trustees, conservators, guardians, personal representatives, and successors-in-interest fully release

8  and discharge Released Parties from any and all PAGA Released Claims," defined as

9  
10  
11  
12  
13  
14  
15  
> all claims, causes of action, damages, wages, benefits, expenses, penalties, debts, rights, demands, liabilities, obligations, attorneys' fees, costs, and any other form of relief or remedy in law, equity, or whatever kind or nature, whether known or unknown, suspected or unsuspected sought pursuant to the PAGA (California Labor Code section 2698, et al.) that occurred at any time during the PAGA Claims Period and that are predicated upon any Labor Code violations of the PAGA in the Action, including, but not limited to all possible California Labor Code Claims listed in the Complaint or that could have been listed in the Action based on the factual and/or legal allegations therein, including but not limited to California Labor Code section 226.2, 226, 226.3, 226.7, 512, 516, 558, 1174, 1174.5, 1194 and 1194.2[2]

16  (Doc. 70-2 at 22–23, 24.)

17  **E.    Summary of the Settlement Terms**

18       Under the proposed settlement, Defendant will pay a total of $400,000 (the "Gross

19  Settlement Amount" or "GSA") allocated as follows: (1) up to $100,000 (25% of the GSA) for

20  attorney's fees and up to $20,000 for litigation costs; (2) $10,000 incentive award for Plaintiff; (3)

21  $20,000 in civil PAGA penalties, with $15,000 of the penalties payable to the California Labor and

22  Workforce Development Agency ("LWDA");[3]  and (4) an estimated $30,000 in settlement

23  administration costs.  (Doc. 70-2 at 7; *see also* Doc. 70 at 2, 7.)

24       Assuming these allocations are awarded in full, approximately $225,000 (the "Net

25  Settlement Amount" or "NSA") will be available for distribution to Settlement Class Members who

26  

27  
28  
---
[3] Pursuant to the PAGA, 75% of the civil PAGA penalties, or 15,000, will go to the LWDA, and 25%, or $5,000, will be allocated to the net settlement amount ("Net Settlement Amount" or "NSA").  (Doc. 70-2 at 9; *see also* Doc. 70 at 7.)  *See* Cal. Lab. Code § 2699(i).

submit a claim form and who do not submit a timely and valid election not to participate in the settlement ("Participating Class Members").  (Doc. 70-2 at 6; *see also* Doc. 70 at 12.)  The NSA shall be divided by the "Total Calendar Weeks," *i.e*., the total number of calendar weeks worked by all Settlement Class Members during the Class Period, and the resulting number will be the "Calendar Week Value."  (Doc. 70-2 at 8.)  Each Participating Class Member's payment under the Settlement Agreement will be calculated by multiplying his or her number of calendar weeks worked during the Class Period by the Calendar Week Value.  (*Id*.)

PAGA Claim Members (whether or not they are Settlement Class Members or Participating Class Members) shall be allocated a *pro rata* portion of the $5,000 PAGA allocation ("Individual PAGA Claim Payments"), which will be divided evenly between the PAGA Claim Members and added to the amount they will receive as Participating Class Member or will be sent separately for Settlement Class Members who have not filed a Claim Form or Class Members that have opted out of the Settlement.  (Doc. 70-2 at 9.)

The resulting sum of the two component payments for Class Members who are also PAGA Claim Members will equal each Participating Class Member's "Individual Settlement Payment." (Doc. 70-2 at 8.)  For Class Members who are not PAGA Claim Members, their Individual Settlement Payment will consist solely of the amount that is the product of their calendar weeks worked within the Class Period times the Calendar Week Value.  (*Id*.) PAGA Claim Members who opt-out of the class settlement shall still receive their Individual PAGA payment, "since there is no right to opt-out of a PAGA settlement."  (*Id*.)

The settlement is "partially reversionary": only Participating Class Members will receive Settlement Payments and only PAGA Claims Members will be allocated and forwarded Individual PAGA Claim Payments, and those amounts not claimed, subject to a "50% floor" on distribution of the NSA.  (Doc. 70-2 at 6–7; *see also* Doc. 70 at 7, 12.)  The 50% floor is defined as follows:

> Regardless of the specific amount or percentage of the NSA that is actually claimed, at least 50% of the NSA shall be distributed to Class members who submit timely claims.  If more than 50% of the NSA is claimed, then the actual amount claimed shall be distributed to the timely claimants, and only the amount of the NSA that remains unclaimed shall revert to Defendant.

(Doc. 70-2 at 7–8.)  Employer side payroll taxes are to be paid from any unclaimed funds above the 50% floor on distribution of the NSA.  (*Id*. at 7.)

Within 60 days after the notice is mailed, the Class Members will be required to accurately complete and sign a "Claim Form."  (Doc. 70-2 at 16–17.)  Settlement Class Members who do not properly or timely submit a Claim Form will not be entitled to any portion of the NSA (other than payments from the PAGA allocation), but will be bound by the release contained in the Settlement Agreement.  (*Id*. at 17.)

Assuming 100 percent participation, the average settlement amount per Participating Class Member will be approximately $40.90 ($225,000 ÷ 5,500).  (*See* Doc. 70 at 2, 7.)  Class Members who do not wish to participate in the settlement or object thereto must give notice within sixty days of the Settlement Administrator mailing out Notice Packets.  (Doc. 70-2 at 18–19.)  If fifteen percent or more of the Class Members opt-out of the settlement, Defendant may elect to rescind the settlement, such that the settlement will become null and void.  (*Id*. at 9.)

Any checks to Participating Class Members that are not cancelled within 180 days from issuance will be deemed void and the Individual Settlement Amount associated with the uncashed check shall be deposited with the Department of Industrial Relations Unpaid Wages Fund in California in the name of the Settlement Class Member or PAGA Claim Member who failed to cash their check.  (Doc. 70-2 at 22.)

### III.      LEGAL STANDARD

#### A.    Rule 23 Settlements

Class actions require the approval of the district court before settlement.  Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval.").  "Approval under 23(e) involves a two-step process in which the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted."  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc*., 221 F.R.D. 523, 525 (C.D. Cal. 2004).

The first step in the two-step process is preliminary approval.  During preliminary approval,

the court conducts a preliminary fairness evaluation to determine if notice of the class action settlement should issue to class members and, if applicable, whether the proposed settlement class should be certified.  *See* David F. Herr, *Ann. Manual Complex Lit.* § 21.632 (4th ed.).  Under Rule 23(e)(1), the court must direct notice to all class members who would be bound by the settlement proposal if the parties show that "the court will likely be able to:" (i) approve the proposal under Rule 23(e)(2)'s fair, reasonable, and adequate standard; and (ii) certify the proposed settlement class.  Fed. R. Civ. P. 23(e)(1); *see also Lounibos v. Keypoint Gov't Sols. Inc.*, No. 12-cv-00636-JST, 2014 WL 558675, at *5 (N.D. Cal. Feb. 10, 2014) (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)) (noting that federal courts generally grant preliminary approval if "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval").

The second step is the final approval.  During final approval, "[i]f the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  In doing so, the court must consider several factors, including whether: "the class representatives and class counsel have adequately represented the class"; "the proposal was negotiated at arm's length"; "the proposal treats class members equitably relative to each other"; and "the relief provided for the class is adequate."  *Id.*  When considering whether "the relief provided for the class is adequate," the court should also take into account:

(i)     the costs, risks, and delay of trial and appeal;

(ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)   the terms of any proposed award of attorney's fees, including timing of payment; and

(iv)    any agreement required to be identified under Rule 23(e)(3).

*Id.*  In addition to the two-step review process, Rule 23(e) also requires that: (i) the parties seeking

10

approval file a statement identifying the settlement agreement; (ii) class members be given an opportunity to object; and (iii) no payment be made in connection with forgoing or withdrawing an objection, or forgoing, dismissing, or abandoning an appeal. Fed. R. Civ. P. 23(e)(3), (5).

"Courts have long recognized that settlement class actions present unique due process concerns for absent class members." *In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d 935, 946 (9th Cir. 2011) (internal quotation marks and citations omitted). To protect the rights of absent class members, Rule 23(e) requires that the court approve such settlements "only after a fairness hearing and a determination that the settlement is fair, reasonable, and adequate." *Id*. at 946. When approval is sought of a settlement negotiated before formal class certification, "there is an even greater potential for a breach of fiduciary duty owed the class during settlement." *Id*. In such circumstances, the "settlement approval requires a higher standard of fairness" and a "more exacting review" so as "to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Lane v. Facebook, Inc*., 696 F.3d 811, 819 (9th Cir. 2012) (internal quotation marks and citations omitted). Rule 23 also "demand[s] undiluted, even heightened, attention" to the certification requirements when class certification is sought only for purposes of settlement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Accordingly, the district court must examine the propriety of certification under Rule 23 both at this preliminary stage and at a later fairness hearing. *See, e.g., Ogbuehi v. Comcast*, 303 F.R.D. 337, 344 (E.D. Cal. Oct. 2, 2014).

**B.    PAGA Settlements**

Under the PAGA, an "aggrieved employee" may bring an action for civil penalties for labor code violations on behalf of herself and other current or former employees. Cal. Lab. Code § 2699(a).[4] A plaintiff suing under the PAGA "does so as the proxy or agent of the state's labor law enforcement agencies." *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009). Thus, a judgment in a PAGA action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government." *Id*.

---

[4] An "aggrieved employee" is defined as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." Cal. Lab. Code § 2699(c).

The PAGA statute imposes several limits on litigants. First, because a PAGA action functions as a "substitute" for an action brought by the state government, a plaintiff suing under PAGA is limited to recovery of civil penalties only, rather than damages or unpaid wages available privately through direct or class action claims. *Iskanian v. CLS Transportation L.A., LLC*, 59 Cal. 4th 348, 381 (2014); *ZB, N.A. v. Superior Court*, 8 Cal. 5th 175, 182, 193 (2019), *rev'd in part on other grounds*, *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906 (2022). Second, to bring an action under PAGA, an aggrieved employee must first provide written notice to the LWDA as well as to the employer. Cal. Lab. Code § 2699.3(a)(1). Third, any civil penalties recovered must be divided 75% with the LWDA and 25% with the aggrieved employees. *Id*. § 2699(i). Fourth, and finally, the proposed settlement must be submitted to the LWDA, and a trial court must "review and approve" any settlement of PAGA claims. *Id*. § 2699(l)(2); *see also Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 971 (N.D. Cal. 2019) (citation omitted) (noting that because settling a PAGA claim "compromises a claim that could otherwise be brought be the state," it requires that a court "review and approve any settlement of any civil action pursuant to [PAGA]").

Although there is no binding authority setting forth the proper standard of review for PAGA settlements, California district courts "have applied a Rule 23-like standard, asking whether the settlement of the PAGA claims is fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes." *Haralson*, 383 F. Supp. 3d at 972 (internal quotation marks omitted). This standard is derived principally from the LWDA itself. In commenting on a proposed settlement including both class action and PAGA claims, the LWDA offered the following guidance:

> It is thus important that when a PAGA claim is settled, the relief provided for under the PAGA be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, the court evaluate whether the settlement meets the standards of being "fundamentally fair, reasonable, and adequate" with reference to the public policies underlying the PAGA.

*O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) (citing the LWDA's guidance with approval).[5] Recognizing the distinct issues presented by class actions, this Court is

---

[5] The LWDA has also stated that it "is not aware of any existing case law establishing a specific benchmark for PAGA settlements, either on their own terms or in relation to the recovery on other claims in the action." *O'Connor v. Uber Techs., Inc.*, No. 3:13-cv-03826-EMC (N.D. Cal. Jul. 29, 2016) (Doc. 736 at 2–3).

1    persuaded by the LWDA's reasoning in *O'Connor* and therefore adopts its proposed standard in

2    evaluating the PAGA portion of the settlement now before the court.  *See, e.g., Castro v. Paragon*

3    *Indus., Inc.*, No. 1:19-cv-00755-DAD-SKO, 2020 WL 1984240, at *6 (E.D. Cal. Apr. 27, 2020);

4    *Patel v. Nike Retail Servs., Inc.*, No. 14-cv-04781-RS, 2019 WL 2029061, at *2 (N.D. Cal. May 8,

5    2019).  Accordingly, the Court will approve a settlement of PAGA claims upon a showing that the

6    settlement terms (1) meet the statutory requirements set forth by the PAGA; and (2) are

7    fundamentally fair, reasonable, and adequate in view of the PAGA's public policy goals.

8           When a proposed settlement involves overlapping class action and PAGA claims, courts

9    may employ a "sliding scale" in determining if the proposed settlement is "fundamentally fair,

10   reasonable, and adequate with reference to the public policies underlying the PAGA."  *O'Connor*,

11   201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972 (following *O'Connor*); *McClure*

12   *v. Brand Energy Serv.*, LLC, No. 2:18-cv-01726-KJM-AC, 2021 WL 2168149, at *10 (E.D. Cal.

13   May 27, 2021) (same); *Cooks v. TNG GP*, No. 2:16-cv-01160-KJM-AC, 2020 WL 5535397, at *9–

14   10 (E.D. Cal. Sept. 15, 2020) (same).  As the district court in *O'Connor* explained:

15
16          For example, if the settlement for the Rule 23 class is robust, the purposes of PAGA
            may be concurrently fulfilled. By providing fair compensation to the class members
16          as employees and substantial monetary relief, a settlement not only vindicates the
            rights of the class members as employees, but may have a deterrent effect upon the
17          defendant employer and other employers, an objective of PAGA. Likewise, if the
            settlement resolves the important question of the status of workers as employees
18          entitled to the protection of the Labor Code or contained substantial injunctive
            relief, this would support PAGA's interest in "augmenting the state's enforcement
19          capabilities, encouraging compliance with Labor Code provisions, and deterring
20          noncompliance."

21

22   *Id*. at 1134–1135 (quoting the LWDA's guidance).  At the same time, where "the compensation to

23   the class amounts is relatively modest when compared to the verdict value, the non-monetary relief

24   is of limited benefit to the class, and the settlement does nothing to clarify [aggrieved workers'

25   rights and obligations], the settlement of the non-PAGA claims does not substantially vindicate

26   PAGA."  *Id*. at 1135.  Finally, "where plaintiffs bring a PAGA representative claim, they take on a

27   special responsibility to their fellow aggrieved workers who are effectively bound by any

28   judgment."  *Id*. at 1134.  Plaintiff's special responsibility to other aggrieved workers is especially

13

1  significant because the "PAGA does not require class action procedures, such as notice and opt-out

2  rights." *Id*.  Thus,

> [t]he Court must be cognizant of the risk that despite this responsibility, there may
> be a temptation to include a PAGA claim in a lawsuit to be used merely as a
> bargaining chip, wherein the rights of individuals who may not even be members
> of the class and the public may be waived for little additional consideration in order
> to induce the employer to agree to a settlement with the class.

7  *Id*.

## IV.      ANALYSIS

### A.      Preliminary Class Certification

On December 3, 2018, the Court granted preliminary certification of the proposed class under Rule 23 and found that Plaintiff had satisfied Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation and Rule 23(b)(3)'s requirements of predominance and superiority.  (*See* Doc. 35.).  The Court will not revisit its analysis in this regard because the parties' proposed settlement class is materially identical to the class that was previously certified.  (*Compare* Doc. 35 at 19 *with* Doc. 70 at 7.)  The only difference is the Class Period, in that it is extended from the date of class certification to the date of preliminary approval of the settlement.  (*See* Doc. 70 at 16.)  Accordingly, the Court will grant conditional certification of the settlement class as defined by the parties in the Settlement Agreement, as follows: "All current and former truck drivers employed by defendant Knight Transportation, Inc., who advised defendant that they resided in Oregon, Nevada, Arizona, Utah, and/or Colorado, who were paid in whole or in part on a piece-rate basis, and who drove one or more routes of five hours or more entirely within the State of California for defendant during the 'Class Period' from September 30, 2012 through [p]reliminary [a]pproval" of the settlement.  (Doc. 70 at 7; Doc. 70-2 at 5–6.)

### B.      Preliminary Settlement Approval

Plaintiff also seeks preliminary approval of the settlement.  Under Rule 23(e), a court may approve a class action settlement only if it is a fair, reasonable, and adequate resolution of the dispute.  *Bluetooth*, 654 F.3d at 946.  "[P]reliminary approval of a settlement has both a procedural and substantive component."  *Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079 (citation omitted).

In particular, preliminary approval of a settlement and notice to the proposed class is appropriate if: (1) the proposed settlement appears to be the product of serious, informed, non-collusive negotiations; and (2) the settlement falls within the range of possible approval, has no obvious deficiencies, and does not improperly grant preferential treatment to class representatives or segments of the class. *Id*.

Here, the Court is troubled by several aspects of the Settlement Agreement that cast doubt on its fairness, as explained below.

### 1. "Opt-In" Process

Plaintiff has structured the Rule 23 class action to require class members to opt in and submit a claim form if they wish to benefit from the settlement. (Doc. 70-2 at 6; *see also* Doc. 70 at 12.) However, a class action brought under Rule 23 binds all members of the certified class unless they opt out of the suit. *See* Fed. R. Civ. P. 23(c)(2)(B)(v) (providing "that the court will exclude from the class any member who requests exclusion"); *McElmurry v. U.S. Bank Nat'l Ass'n*, 495 F.3d 1136, 1139 (9th Cir. 2007) ("In a class action, once the district court certifies a class under Rule 23, all class members are bound by the judgment unless the opt out of the suit."). As a preliminary matter, "requiring Rule 23 class members to opt in to a settlement appears, at least arguably, contrary to law." *Maciel v. Bar 20 Dairy*, LLC, No. 1:17-cv-00902-DAD-SKO, 2018 WL 5291969, at *7 (E.D. Cal. Oct. 23, 2018) (citing *Ackal v. Centennial Beauregard Cellular L.L.C.*, 700 F.3d 212, 217 (5th Cir. 2012) ("Simply put, there is no authority for establishing 'opt-in' classes in which the class members must take action to be included in the class.") (citation and internal quotation marks omitted); *Estate of Kern v. Siemens Corp.*, 393 F.3d 120, 124 (2d Cir. 2004) ("Not only is an 'opt in' provision not required, but substantial legal authority supports the view that by adding the 'opt out' requirement to Rule 23 in the 1966 amendments, Congress prohibited 'opt in' provisions by implication."); *Clark v. Universal Builders, Inc.*, 501 F.2d 324, 340 (7th Cir. 1974) ("The requirement of an affirmative request for inclusion in the class is contrary to the express language of Rule 23(c)(2)(b).")).

Plaintiff has provided no justification for why the administration of the Rule 23 claims should not proceed under the typically recognized opt out procedure. Indeed, it appears Defendant

already maintains all the information necessary to process claims to the Rule 23 class members. The Settlement Agreement provides that, to provide notice to the class, Defendant shall submit to the Settlement Administrator a list of Settlement Class and PAGA Claim Members reflecting names, last-known addresses, dates of employment, social security numbers, and number of calendar weeks worked.  (Doc. 70-2 at 14.)  Should any class notice mailed to a Settlement Class Member be returned as undeliverable, the Settlement Administrator will perform a skip trace search to seek an address correction for that Class Member.  (*Id*. at 16.)  It is not clear to the Court, and Plaintiff offers no explanation, why this process cannot be used to pay settlements directly to the class members who do not opt out of the Rule 23 class action.[6]

### 2.      50% Floor and Reversion

The court is especially wary of Plaintiff's proposed opt-in Rule 23 process where, as here, Defendant has only guaranteed that it will pay up to 50 percent of the GSA, even if less is claimed by the Class, with the remainder to revert to Defendant.  (Doc. 70-2 at 6–8; *see also* Doc. 70 at 7, 12.)  Requiring the Rule 23 class members to submit a claim form minimizes the likely settlement payments.  *See Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 391 (C.D. Cal. 2007) ("In reality, the bulk of the economic relief hypothetically available under the Settlement is merely illusory due to its strict eligibility conditions, while much of what is attainable will go unpaid as a result of the claims-made process."); *Sylvester v. CIGNA Corp*., 369 F. Supp. 2d 34, 52 (D. Me. 2005) (" 'Claims made' settlements regularly yield response rates of 10 percent or less.").  Here, because Defendant already maintains a list of the last-known addresses of the class members, the claims process for the Rule 23 class appears to serve little purpose other than to minimize Defendant's ultimate payout under the proposed settlement.

With respect to the reversion, the Ninth Circuit has counseled that "courts must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the

---

[6] The requirement to "opt-in" is particularly problematic when considering that, under the release provisions of the Settlement Agreement, Class Members are bound to releasing claims even if they do not submit a claim form (*see* Doc. 70-2 at 22–23).  *See Maciel v. Bar 20 Dairy, LLC*, No. 1:17-CV-00902-DAD-SKO, 2020 WL 5095885, at *19 (E.D. Cal. Aug. 28, 2020) (noting the court's previous rejection of release provisions that would "bind the Class Members to releasing the Released Claims even if they did not submit a claim form.").

16

negotiations." *In re Bluetooth*, 654 F.3d at 947. Among those "subtle signs" include when the parties arrange for funds not awarded to revert back to Defendant. *Id.* In the absence of any justification for the reversion, a concern arises that it is included in the settlement because Defendant hopes to ultimately pay less than the maximum settlement amount. This would not appear to be fair or reasonable. The settlement amount is the amount that defendant voluntarily decided to pay in order to settle this lawsuit, and "[t]here is no reason not to require Defendant to actually pay this sum of money." *La Parne v. Monex Deposit Co.*, No. SACV 08-0302 DOC (MLGx), 2010 WL 4916606, at *4 (C.D. Cal. Nov. 29, 2010).

The Court does not suggest that a reversion to Defendant could *never* be justifiable. Cf. *Dudum v. Carter's Retail, Inc.*, No. 14-cv-00988-HSG, 2016 WL 7033750, at *5 (N.D. Cal. Dec. 2, 2016) ("Because the reversion only applies to the penalty-proxy amount, and the Class Members who do not opt out are guaranteed more than the maximum wages they were underpaid, the Court finds that the reversionary provision does not render the Settlement Agreement inherently inadequate."); *Hightower v. JPMorgan Chase Bank, N.A.*, No. CV 11-1802 PSG (PLAx), 2015 WL 9664959, at *7 (C.D. Cal. Aug. 4, 2015) (granting final approval to class action settlement with reversion clause because "Plaintiffs would likely not have been able to negotiate a maximum amount of even $12 million without this clause and have taken methods to increase participation in the Settlement Agreement. For example, Plaintiffs caused Notice Packets to be mailed to over 145,000 putative class members and then reminder post cards a month later to those putative class members who had not responded."). However, Plaintiff has not provided any justification for such a provision in this case.

### 3.   Valuation of the Settlement

#### a.   Labor Code Claims

In evaluating the fairness of a settlement award, "the settlement's benefits must be considered by comparison to what the class actually gave up by settling." *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1123 (9th Cir. 2020) (citing *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968) ("Basic to [the] process [of evaluating settlements] ... is the need to compare the terms of the compromise with the likely rewards of

17

litigation.")).  However, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000), *as amended* (June 19, 2000) (citation omitted).  To determine whether a settlement "falls within the range of possible approval," a court must focus on "substantive fairness and adequacy" and "consider plaintiffs' expected recovery balanced against the value of the settlement offer."  *Tableware Antitrust Litig*., 484 F. Supp. 2d at 1080.

Here, Plaintiff has failed to supply "enough information to evaluate the strengths and weaknesses of [his] case."  *Eddings v. DS Servs. of Am., Inc.*, No. 15-CV-02576-VC, 2016 WL 3390477, at *1 (N.D. Cal. May 20, 2016).  According to the complaint, for years Defendant's drivers were not compensated for all of their time on the job, were not offered all of the meal and rest breaks guaranteed by California law, and did not receive wage statements that complied with California law.  The total recovery by the Participating Settlement Class Members, however, amounts to approximately $40.90 per member.

Counsel has submitted a declaration with claim-by-claim estimates of the Defendant's exposure.  (*See* Doc. 70-1 at ¶ 18.)  According to his estimate, a full recovery would be more than $4 million. (*See id*.)  Here, the GSA here is $400,000—just 9.8 percent of the total potential recovery for Plaintiff's claims.  When the total potential recovery is compared to the estimated NSA of $225,000, that percentage drops to 5.5.

Counsel excuses this discount as necessary to account for Defendant's defenses to the litigation, including the "legality of Defendant's compensation policy," the "inapplicability of California law to non-resident drivers," "FMCSA preemption," risk of de-certification," a lack of derivative penalties, and "other risk factors."  (Doc. 70-1 at ¶ 17.)  The discount is itemized by percentage based on the risk assessed (*see id* at ¶ 19), but there is no explanation as to how each percentage was arrived at.  Courts, including this one, have required more.  *See Borelli v. Black Diamond Aggregates, Inc.,* No. 2:14-CV-02093-KJM-KJN, 2021 WL 5139610, at *2 (E.D. Cal. Nov. 4, 2021) (requiring "a more searching analysis" of litigation risks before approving settlement where the amount class members received 11 percent of total exposure); *Hunt v. VEP Healthcare,*

1  *Inc.*, No. 16-CV-04790-VC, 2017 WL 3608297, at *1 (N.D. Cal. Aug. 22, 2017) ("The motion for

2  preliminary approval makes abstract gestures to the uncertainties of litigation, rather than offering

3  a careful analysis of the claims and the strength or weakness of any potential defenses."); *Eddings,*

4  2016 WL 3390477, at *1 ("The plaintiffs list legal issues that this case might present and positions

5  that the defendants might take, but they don't analyze those issues or evaluate the strength or

6  weakness of defendants' positions.  A party moving for preliminary approval should cite case law

7  and apply it to explain why each claim or defense in the case is more or less likely to prove

8  meritorious.").

9      While Plaintiff defends the Gross Settlement amount as "higher value than what Plaintiff

10  expected to obtain at trial" (Doc. 70 at 26), his assessment of such risk-adjusted settlement value,

11  which results in these low percentages, demonstrates a lack of support such that the Court cannot

12  at this time find that the settlement is fair and reasonable.  Risks such as those identified above may

13  justify a significant discount.  *See Smothers v.* NorthStar *Alarm Servs., LLC*, No. 17-00548, 2019

14  WL 280294, at *12 (E.D. Cal. Jan. 22, 2019).  But any future motion must articulate particularized

15  reasons why the proposed discount(s) is appropriate.

16                          *b.     PAGA Claim*

17      Plaintiff seeks to settle the PAGA claim for $20,000—75 percent paid to the LWDA and

18  25 percent to the Settlement Class—despite asserting its maximum value is $1,807,470.  This

19  $1,807,470 amount makes up 44 percent of the total verdict value of the case.  Yet Plaintiff proposes

20  settling the PAGA claim for 1.1 percent of its estimated full worth.  Plaintiff offers no rationale for

21  settling the PAGA claim for such a relatively meager value.  *See O'Connor*, 201 F. Supp. 3d at

22  1133–34 (rejecting a proposal to settle PAGA claims for $1 million where counsel previously

23  valued them at over $1 billion, noting the court's concern that the PAGA claim was being used

24  "simply as a bargaining chip in obtaining a global settlement for Uber's benefit, even though the

25  PAGA claim alone is worth more than half of the full verdict value of all claims being released.").

26      Plaintiff points to the Court's discretion to reduce the amount of PAGA penalties, along

27  with the fact that Plaintiff would not be able to recover PAGA penalties if he were unable to prevail

28  on his claims under the Labor Code.  Both of these points are correct: trial courts retain discretion

1    concerning the amount of PAGA penalties to be awarded, *see* Cal. Labor Code § 2699(e)(2) (noting

2    "a court may award a lesser amount than the maximum civil penalty amount specified by this part

3    if, based on the facts and circumstances of the particular case, to do otherwise would result in an

4    award that is unjust, arbitrary and oppressive, or confiscatory"), and PAGA penalties would be

5    unavailable were Plaintiff unable to prevail on his claims for rest break violations, *see id.* §2699(a).

6    However, as explained above, the Court finds the assessment of the risk of prevailing on Plaintiff's

7    Labor Code claims unsupported.  The failure to adequately explain the overly excessive discounts

8    on those claims prevents the Court from any "real evaluation of the reasonableness of this

9    settlement" with respect to the PAGA penalties.  *See Gonzalez v. CoreCivic of Tennessee*, LLC,

10   No. 1:16-cv-01891-DAD-JLT, 2018 WL 4388425, at *9 (E.D. Cal. Sept. 13, 2018).

11       In sum, the settlement's allocated PAGA recovery of 1.1 percent is on the border of

12   percentages that raise heightened concerns.  The Court therefore defers resolution of its adequacy

13   pending further information from the parties regarding the reasons for discounted recovery of both

14   the Rule 23 and PAGA claims.

15           *c.*     *Summary*

16       In light of the foregoing, the Court cannot conclude that Plaintiff has made an adequate

17   showing sufficient to warrant a preliminary finding that the proposed settlement is fair, reasonable,

18   and adequate.  As set forth above, the GSA amount here is for $400,000—just 9.8 percent of the

19   total potential recovery for Plaintiff's claims.  Although it is true that a settlement agreement

20   amounting to a low percentage of the class's potential recovery does not render the agreement *per

21   se* inadequate or unfair, see *Officers for Justice*, 688 F.2d at 628, Plaintiff does not adequately

22   explain what appears to be an overly aggressive discounting of the claims in this case.  Procedurally,

23   this raises concerns about whether Plaintiff's counsel adequately represented the interests of the

24   absent putative class members in settlement negotiations and the extent to which the proposed

25   settlement is the product of a well-informed negotiation.  Substantively, such an aggressive

26   discounting of the putative class's claims presents an impediment to the fairness and reasonableness

27   determination.  To address whether a proposed settlement is substantively fair or adequate, courts

28   must "consider plaintiffs' expected recovery balanced against the value of the settlement offer."

20

*Tableware*, 484 F. Supp. 2d at 1080.  Plaintiff asserts that the proposed settlement is "higher value than what Plaintiff expected to obtain at trial" (Doc. 70 at 26), yet it is not clear that this "value" is an accurate assessment of Defendant's exposure for Plaintiff's claims.  In the absence of justification for the valuation of Plaintiff's claims, the Court is unable to balance the proposed against the expected recovery of those claims and therefore cannot find that the proposed settlement is reasonable or "within the range of possible approval." *Tableware*, 484 F. Supp. 2d at 1079.

4.   Incentive Award

Plaintiff also requests that the Court approve an incentive payment in an amount of $10,000 to be awarded to Robert Martinez as named plaintiff (the "Incentive Award").  (Doc. 70-2 at 7, 11–12.)

A district court may award incentive payments to named plaintiffs in class action cases. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009).  The purpose of incentive awards is to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaking in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Id*.  To justify an incentive award, a class representative must present "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc*., 252 F.R.D. 652, 669 (E.D. Cal. 2008).  Such incentive awards are particularly appropriate in wage-and-hour actions where a plaintiff undertakes a significant reputational risk in bringing suit against their employer. *Rodriguez*, 563 F.3d at 958–59.

The Ninth Circuit has emphasized, however, that "district courts must be vigilant in scrutinizing all incentive awards." *Radcliffe v. Experian Info. Sols., Inc*., 715 F.3d 1157, 1165 (9th Cir. 2013) (internal quotation marks and citation omitted).  In keeping with that admonition, district courts have declined to approve incentive awards that represent an unreasonably high proportion of the overall settlement amount or are disproportionate relative to the recovery of other class members. *See Ontiveros v. Zamora*, 303 F.R.D. 356, 365–66 (E.D. Cal. 2014) (finding an incentive award of $20,000, comprising 1% of the common fund, to be excessive under the circumstances,

1    and reducing the award to $15,000, where class representative spent 271 hours on the litigation and

2    relinquished the opportunity to bring several of his own claims in order to act as class

3    representative); *see also Ko v. Natura Pet Prods., Inc*., No. C 09–2619 SBA, 2012 WL 3945541,

4    at *15 (N.D. Cal. Sept. 10, 2012) (holding that an incentive award of $20,000, comprising one

5    percent of the approximately $2 million common fund was "excessive under the circumstances"

6    and reducing the award to $5,000); *Wolph v. Acer Am. Corp.*, No. C 09–01314 JSW, 2013 WL

7    5718440, at *6 (N.D. Cal. Oct. 21, 2013) (reducing the incentive award to $2,000 where the class

8    representatives did not demonstrate great risk to finances or reputation in bringing the class action).

9    In reducing the award, courts have noted that overcompensation of class representatives could

10   encourage collusion at the settlement stage of class actions by causing a divergence between the

11   interests of the named plaintiff and the absent class members, destroying the adequacy of class

12   representatives. *See Staton v. Boeing Co.*, 327 F.3d 938, 977–78 (9th Cir. 2003); *see also Radcliffe*,

13   715 F.3d at 1165.

14        Here, the Settlement Agreement provides for a maximum Incentive Award of $10,000.

15   Plaintiff represents that the award is intended to compensate him for his "over five years" of active

16   participation in this case, including participating in interviews and phone conferences, locating and

17   producing documents, reviewing pleadings in the case, consulting with counsel on "key factual

18   issues," reviewing documents and data provided by Defendant, providing "multiple declarations,"

19   reviewing and approving "the settlement papers," and being "available during the all-day mediation

20   in this case." (Doc. 70-5 at ¶ 5.) Plaintiff also notes that he undertook a significant reputational

21   risk by bringing suit against Defendant. (*Id*. at ¶ 8.)

22        The Court finds that the proposed $10,000 Incentive Award appears to be excessive under

23   the circumstances of the case. It is two times the amount that the Ninth Circuit has considered

24   reasonable. *See Resnick v. Frank (In re Online DVD–Rental Antitrust Litig.)*, 779 F.3d 934, 947

25   (9th Cir. 2015). It also constitutes 2.5 percent of the GSA and is almost 250 times higher than the

26   estimated $40.90 average payment for the other class members. *See Sandoval v. Tharaldson Emple.*

27   *Mgmt.*, No. EDCV 08-482-VAP (OPx), 2010 WL 2486346, at *9–10 (C.D. Cal. June 15, 2010)

28   (collecting cases and concluding that plaintiff's request for an incentive award representing one

percent of the settlement fund was excessive).  *See also Sanchez v. Frito-Lay, Inc.*, No. 1:14-cv-00797-DAD-BAM, 2019 WL 4828775, at *20–21 (E.D. Cal. Sept. 30, 2019).  (recommending $10,000 incentive award payment to named plaintiff be reduced to $7,500), *report and recommendation adopted*, No. 1:14-CV-797-AWI-MJS, 2015 WL 5138101 (E.D. Cal. Aug. 26, 2015).

For these reasons, the Court cannot recommend approval of an Incentive Award in the amount of $10,000 at this time.  Should Plaintiff renew his request for an incentive award that amounts to a similarly high proportion of the overall settlement amount or is disproportionate relative to the recovery of other class members, he must provide clear and specific evidence demonstrating significant contributions to the litigation of this case.

5.      Opt-Out Process

Due process requires that any class member bound by a class action settlement, at a minimum, be afforded the opportunity "to remove himself from the class."  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848 (1999) (citation and internal quotation marks omitted).  Here, the settlement and class notice are devoid of any provision that would exclude members from the Settlement Class who do not receive the notice of this litigation.

Unless a class member elects to opt-out of the settlement, according to the Settlement Agreement, they are subject to the above-described release.  (*See* Doc. 70-2 at 19.)  A class member cannot opt out of the litigation, however, unless they submit a request to be excluded (*see id.*), and a class member cannot request to be excluded unless they have notice of the litigation.  Under the Settlement Agreement, the Settlement Administrator would send a notice form to the last-known address of each class member via first-class mail.  (*Id*. at 15.)  In the event the notice mailed to a class member is returned as undeliverable, the Administrator shall perform a "skip-trace" search and seek an "updated address" for such class member, at which time a second notice will be mailed. (*Id*. at 16.)  The Settlement Agreement does not address situations where no address correction is obtained as a result of the skip trace search, or where the second notice is returned as undeliverable. In those situations, due process would require those class members be excluded from the Settlement Class.  *See, e.g., Sanchez v. Frito-Lay, Inc., No.* 1:14-CV-00797 AWI, 2015 WL 4662636, at *12

23

1   (E.D. Cal. Aug. 5, 2015), *report and recommendation adopted,* No. 1:14-CV-797-AWI-MJS, 2015

2   WL 5138101 (E.D. Cal. Aug. 26, 2015).  Because the settlement does not appear to exclude from

3   it any class member whose class notice is returned as undeliverable by the post office (either on the

4   first or second attempt), the Court cannot conclude that the settlement affords minimum due process

5   to each of the putative class members.

6                                    **V.       CONCLUSION AND ORDER**

7         The Court finds that Plaintiff has not demonstrated that preliminary approval of the

8   proposed settlement is warranted.  While the Court is mindful of the strong judicial policy favoring

9   settlements, *see Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992), this

10  settlement cannot be approved without additional information and amendment.  Plaintiff's motion

11  for preliminary approval of a class action settlement (Doc. 70) is hereby DENIED, without

12  prejudice to Plaintiff renewing the motion to address the issues and concerns identified herein.

13

14  IT IS SO ORDERED.

15  Dated:   **October 25, 2022**                        */s/ Sheila K. Oberto*

16                                                       UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28