1

2

3

4

5

6

7

8

9                           UNITED STATES DISTRICT COURT

10                      FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12   ROBERT MARTINEZ, an individual, on          No.  1:16-cv-01730-SKO
     behalf of himself and all others similarly
13   situated,                                   **ORDER VACATING HEARING AND**
                                                 **GRANTING PRELIMINARY APPROVAL**
14                   Plaintiff,                  **OF CLASS ACTION SETTLEMENT AND**
                                                 **CONDITIONAL CERTIFICATION OF**
15         v.                                    **SETTLEMENT CLASS**

16   KNIGHT TRANSPORTATION, INC. dba             (Doc. 80)
     ARIZONA KNIGHT
17   TRANSPORTATION, INC.,

18                   Defendant.

19

20

21         This matter is before the court on Plaintiff's renewed motion for preliminary approval of a

22   class action settlement and conditional certification of settlement class filed on January 30, 2023.

23   (Doc. 80.)  The matter is unopposed (*see* Docket) and shall be submitted on the papers.  *See* E.D.

24   Cal. Local Rule 230(g).  Accordingly, the hearing on the motion set for March 29, 2023, will be

25   vacated.

26         For the reasons explained below, the Court grants preliminary approval of the proposed

27   class action settlement.

28

## I.    BACKGROUND

Plaintiff and the putative class members were employed as truck drivers by Defendant. (Doc. 2-1 at 13.)  Their job responsibilities included making deliveries of dry goods, produce, materials, and other products to various businesses located throughout California.  (*Id.* at 13.)

Plaintiff and the putative class members allege that they typically worked between 10 and 14 hours per day, 5 to 6 days per week, and 52 weeks per year.  (*Id.*)  According to the allegations of the complaint, Defendant failed to provide class members with appropriate meal and rest breaks as required under California law.  (*Id.* at 13–14.)  Moreover, although the class members were compensated based on a piece-rate formula, Defendant did not pay them a separate hourly wage to compensate them for rest breaks and for performing non-driving tasks.  (*Id.* at 13.)

Based on these allegations, Plaintiff originally filed his class action complaint in the Tulare County Superior Court on September 30, 2016.  (Doc. 2-1 at 8.)  Plaintiff's complaint asserts wage, hour, and other labor-related claims in violation of the California Labor Code and California Business and Professions Code, which Plaintiff alleges give rise to penalties under California's Private Attorney's General Act ("PAGA").  (*Id*. at 18–26.)  Defendant answered the complaint on November 10, 2016 (Doc. 2-1 at 30–40), and removed the case to this Court on diversity grounds under the Class Action Fairness Act ("CAFA"), 28 U.S.C § 1332(d), on November 14, 2016 (Doc. 2 at 2).  On March 21, 2017, Defendant filed a motion to change venue seeking transfer of the action to the District of Arizona pursuant to 28 U.S.C. § 1404(a).  (Doc. 8.)  The motion was denied on June 23, 2017.  (Doc. 19.)

The parties then "exchange[d] formal written discovery" and Plaintiff deposed Defendant's Fed. Civ. P. 30(b)(6) designee.  (Doc. 80 at 12.)  Defendant produced documents, including its written meal and rest period policies and other policies applicable to its truck drivers, "sample trip sheets," "Movement display data from the trucks' onboard computer systems," a sample "trip dispatch report," and a putative class list.  (*Id*.)

On March 2, 2018, Plaintiff filed a motion to certify the class (Doc. 25), which was granted on December 3, 2018 (Doc. 35).  The Court certified the following class:

All current and former truck drivers employed by defendant Knight Transportation, Inc., who advised defendant that they resided in Oregon, Nevada, Arizona, Utah, and/or Colorado, who were paid in whole or in part on a piece-rate basis, and who drove one or more routes of five hours or more entirely within the State of California for defendant during the "Class Period" from September 30, 2012 through [December 3, 2018].

(Doc. 35 at 19 (the "Class).)  The Class was certified as to the following causes of action:

1.   Plaintiff's first cause of action for Defendant's failure to provide duty-free meal breaks and pay missed meal break premium in violation of Labor Code § 512 and 226.7 and Wage Order No. 9-2001, § 11 (challenging Defendant's uniform cargo security policy that drivers had to watch their trucks at all times, even while eating);

2.   Plaintiff's second cause of action for Defendant's failure to pay Class members separately and hourly for time spent on inspections and detention time in California in violation of Labor Code §§ 1194 and 226.2 (challenging Defendant's uniform compensation policy that paid its non-resident drivers for routes that began and ended in California on a "per mile" basis with some additional hourly pay for detention time over two hours, but no separate and hourly pay for inspection and detention time);

3.   Plaintiff's third cause of action for Defendant's failure to provide the Class with paid rest breaks and pay rest break premiums for unpaid rest breaks of Class members on their California routes in violation of Labor Code § 226.7 and Wage Order No. 9-2001, § 12(A)-(B) (challenging Defendant's uniform compensation and rest break policy and practice failed to provide separate and hourly pay for Class members' rest periods on their routes that began and ended in California); and

4.   Plaintiff's sixth cause of action for Defendant's unfair business practices, in violation of Business and Professions Code §§ 17200 et seq. (the "UCL"), based entirely on the foregoing violations, all of which occurred 100% within the State of California.

(Doc. 35 at 2; *see also* Doc. 2-1 at 18–26.)[1]

In December 2018, the Federal Motor Carrier Safety Administration ("FMCSA") issued a "determination" preempting California's meal and rest break laws for drivers subject to certain federal regulations, and four petitions for review challenging the FMCSA determination were subsequently filed before the Ninth Circuit.  (Doc. 80-1 at ¶ 12.)  Anticipating that the Ninth

---

[1] Plaintiff did not pursue certification of his fourth and fifth causes of action, waiting time and wage statement penalty claims, respectively.  (*See* Doc. 70-1 at 13 n.8.)

3

1    Circuit's decision could impact some of the claims in this case, the parties stipulated to stay this

2    matter until the Ninth Circuit issued its decision.  (Docs. 51 & 52.)  In January 2021, the Ninth

3    Circuit panel denied the petitions for review of the FMCSA's determination and held that the

4    determination merits deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,*

5    *Inc.*, 467 U.S. 837 (1984).  (*See* Doc. 80-1 at ¶ 12.)  The Ninth Circuit panel in *IBT v. FMCSA*

6    declined to consider whether the FMCSA's determination applies retroactively.  (*See id*.)

7    Accordingly, the Court lifted the stay on March 20, 2021.  (Doc. 60.)

8         Following the lifting of the stay, the parties agreed to participate in private mediation and

9    an exchange of additional informal discovery and information.  (Doc. 80 at 11.)  Among other data

10    and information, Defendant provided information regarding the number of Class members and

11    workweeks during the Class period.  (*Id*.)  In June 2021, the parties attended an all-day mediation

12    before Mark S. Rudy, who Plaintiff's counsel describes as a "well-respected wage and hour

13    mediator."  (Doc. 80-1 at ¶ 13.)  The parties were unable to reach a resolution on the date of

14    mediation, in part due to the then-pendency of *Ayala v. U.S. Xpress Enterprises, Inc.*, 851 F. App'x.

15    53 (9th Cir. 2021), which concerned whether a 2020 decision by the California Supreme Court

16    "essentially eliminated minimum wage claims regarding piece-rate in the trucking industry."  (Doc.

17    80 at 13.)  Following the mediation, the Ninth Circuit decided *Ayala* in favor of the trucking

18    company, "thus all but eliminating Plaintiff's minimum wage/piece rate claim," and the parties

19    continued settlement discussions "over the following months" with further input from the mediator.

20    (*Id*. at 14.)  "[A]fter extensive arms' length [and] intensive negotiations," and with the assistance

21    of the mediator, the parties were ultimately able to reach a settlement in principle in September

22    2021 and ultimately executed a "Stipulation of Class and PAGA Representative Action Settlement

23    and Release" (the "Settlement Agreement").  (*Id*.; Doc. 80-1 ¶¶ 13, 32.  *See also* Doc. 80-2.)

24         On November 10, 2021, Plaintiff filed an unopposed motion for preliminary approval of the

25    class action settlement, which was denied without prejudice on October 25, 2022.[2]  (*See* Docs. 70

26    & 79.)  Prior to the denial of Plaintiff's motion, the Ninth Circuit had not decided whether the

27

28    [2]  On September 23, 2022, the parties consented to the jurisdiction of the U.S. Magistrate Judge, and the motion was reassigned to the undersigned.  (*See* Docs. 76–78.)

FMCSA's preemption determination applied retroactively, as noted above.  Two weeks after the denial, the Ninth Circuit decided *Valiente v. Swift Transportation Co. of Arizona, LLC*, 54 F.4th 581, 586 (9th Cir. 2022), holding that FMCSA's preemption determination was retroactive.  (Doc. 80 at 14.)  According to Plaintiff, the decision "completely eviscerated Plaintiff's second and third causes of action for violations of California's meal and rest break laws and, with it, nine years of potential liability.  (Doc. 80-1 ¶ 16.)  As a result, there has been a "fundamental[] change[] [in] the status of the action, as Plaintiff is left with only a claim for Defendant's alleged failure to pay separately for inspection time and detention time, which is subject to strong defenses based on the Ayala case; and UCL and PAGA claims that were entirely based on the viability of the three causes of action."  (*Id*.)

On January 30, 2023, Plaintiff filed the instant renewed motion for preliminary approval of the class action settlement.  (Doc. 70.)

## II.    THE PROPOSED SETTLEMENT

### A.    The Class

For settlement purposes, the parties request approval of the following class (the "Class") of an estimated 5,500 individuals (the "Settlement Class" or "Settlement Class Members"): "all current and former truck drivers employed by defendant Knight Transportation, Inc., who advised defendant that they resided in Oregon, Nevada, Arizona, Utah, and/or Colorado, who were paid in whole or in part on a piece-rate basis, and who drove one or more routes of five hours or more entirely within the State of California for defendant during the 'Class Period' from September 30, 2012 through [p]reliminary [a]pproval" of the settlement.  (Doc. 80 at 15; Doc. 80-2 at 5–6.)

### B.    PAGA Claim Members

Plaintiff has defined "PAGA Claim Members" as "any and all Class Members, who worked for Defendant at any time from September 27, 2015 up to preliminary approval" of the settlement.  (Doc. 80-2 at 6.)  Twenty-five percent of the civil PAGA penalties will be paid to the PAGA Claim Members as part of their PAGA payment share, as described below.  (*Id*. at 9.)

### C.    The Settlement Period

For settlement purposes, the parties have defined the "Class Period" as the period from

"September 30, 2012 through [p]reliminary [a]pproval" of the settlement.  (Doc. 80-2 at 6.)  By contrast, the relevant period for the PAGA claims is September 27, 2015, through preliminary approval.  (*Id.*)

**D.      The Release of Claims**

The Settlement Agreement defines the Released Parties as "(a) all of Knight's present and former parent companies, subsidiaries, related or affiliated companies (including but not limited to Knight-Swift Transportation Holdings, Inc. and Knight Truck and Trailer Sales LLC); (b) Knight's divisions, and (c) the present and former officers, directors, members, managers, shareholders, agents, insurers, administrators, fiduciaries, trustees, operators, partners, joint ventures, franchisees, franchisors, consultants, contractors, attorneys, successors or assignees."  (Doc. 80-2 at 22.)  The Released Claims are defined as:

> claims, debts, liabilities, demands, obligations, guarantees, costs, expenses, interest, attorneys' fees, damages, action or causes of action under state *[sic]* including: (1) failure to provide timely duty-free meal periods in violation of California Labor Code sections 512, 516, 226.7 and Section 11 of IWC Wage Order No. 9; (2) failure to pay separately and hourly for non-driving time and rest breaks in violation of California Labor Code sections 1194, 1194.2 and 226.2; (3) failure to authorize and permit paid rest breaks and pay missed rest break premiums in violation of California Labor Code sections 226.7, 516 and Section 12 of IWC Wage Order No. 12; (4) failure to timely furnish accurate itemized wage statements in violation of Labor Code sections 226, 226.2, and Section 5 of IWC Wage Order No. 9-2001; (5) failure to pay wages upon separation in violation of California Labor Code sections 201-203); (6) unfair competition for all possible claims listed above under California Business and Professions Code sections 17200 et. seq. and (7) a PAGA cause of action for all possible claims listed above and all other civil penalty claims under California Labor Code sections 226.3, 226.7, 512, 558, 1174, 1174.5, California Labor Code section 2698, et al.  [] The release of the foregoing claims and definition of Released Claims, extends to all theories of relief regardless of whether the claim is, was or could have been alleged as separate claims, causes of action, lawsuits or based on other theories of relief, whether under California law, federal law, any state law or common law (including, without limitation, as violations of the California Labor Code, the Wage Orders, applicable regulations, California's Business and Professions Code section 17200, any and all claim *[sic]* under the Fair Labor Standards Act based on the factual allegations in the Complaint and any benefits under any benefit plan, program or policy sponsored or maintained by the Company, including, but not limited to the Employee Retirement Income Security Act, 29 U.S.C. §1001, et seq., but not vested benefits under any pension or 401(k) plan or other ERISA-governed benefit plan.  "Released Claims" includes all types of relief available for the above-referenced claims, including any

claims for damages, restitution, losses, penalties, fines, liens, attorneys' fees, costs, expenses, debts, interest, injunctive relief, declaratory relief, or liquidated damages. In addition, each member of the Class who does not submit a valid request for exclusion forever agrees that he or she will not institute any action, nor accept back liquidated damages, punitive damages, penalties of any nature (other than the PAGA Released Claims), attorneys' fees and costs, or any other relief from any other suit, class or collective action, administrative claim or other claim of any sort or nature whatsoever against Knight, for the Settlement Class Period for the claims being released herein. In accordance with the Court's February 17, 2023 Order, the Parties agree that, notwithstanding anything to the contrary herein, the foregoing released claims are limited to those based on the factual allegations in Plaintiff's operative Complaint.

(Doc. 82-1 at 23–24.)[3]  The Settlement Agreement provides, upon final approval of the settlement, "Plaintiff, on his own behalf and as the Class Representative, all members of the Settlement Class and all persons purporting to act on their behalf or purporting to assert a claim under or through them, including, but not limited to, their dependents, heirs and assigns, beneficiaries, devisees, legatees, executors, administrators, trustees, conservators, guardians, personal representatives, and successors-in-interest . . . fully release and discharge Released Parties from any and all Released Claims arising during the Class Period." (*Id.* at 22–23.)

The Settlement Agreement also provides for the release of PAGA claims, in which "Plaintiff, on his own behalf and all PAGA Claim Members and all persons purporting to act on their behalf or purporting to assert a claim under or through them, including, but not limited to, their dependents, heirs and assigns, beneficiaries, devisees, legatees, executors, administrators, trustees, conservators, guardians, personal representatives, and successors-in-interest fully release and discharge Released Parties from any and all PAGA Released Claims," defined as

all claims, causes of action, damages, wages, benefits, expenses, penalties, debts, rights, demands, liabilities, obligations, attorneys' fees, costs, and any other form of relief or remedy in law, equity, or whatever kind or nature, whether known or unknown, suspected or unsuspected sought pursuant to the PAGA (California Labor Code section 2698, et al.) that occurred at any time during the PAGA Claims

---

[3] On February 17, 2023, the Court issued an order observing that the scope of the class release was overly broad and ordering the parties to either revise the release language or defend its breadth with pertinent case authority. (*See* Doc. 81.)  In response to the Court's order, the parties amended their release and submitted it for consideration on March 7, 2023, as part of their re-executed Settlement Agreement. (*See* Doc. 82.)  Other than the changes to the release language, the re-executed Settlement Agreement is "otherwise the same as the originally executed Settlement Agreement" (Doc. 82-1 at 3), and the latter is referred to throughout this Order except where it differs from the re-executed version.

Period and that are predicated upon any Labor Code violations of the PAGA in the Action, including, but not limited to all possible California Labor Code Claims listed in the Complaint or that could have been listed in the Action based on the factual and/or legal allegations therein, including but not limited to California Labor Code section 226.2, 226, 226.3, 226.7, 512, 516, 558, 1174, 1174.5, 1194 and 1194.2.  In accordance with the Court's February 17, 2023 Order, the Parties agree that, notwithstanding anything to the contrary herein, the foregoing released claims are limited to those based on the factual allegations in Plaintiff's operative Complaint.

(Doc. 82-1 at 23, 24.)

**E.    Summary of the Settlement Terms**

Under the Settlement Agreement, Defendant will pay a total of $400,000 (the "Gross Settlement Amount" or "GSA") allocated as follows: (1) up to $100,000 (25% of the GSA) for attorney's fees and up to $20,000 for litigation costs; (2) $10,000 incentive award for Plaintiff; (3) $20,000 in civil PAGA penalties, with $15,000 of the penalties payable to the California Labor and Workforce Development Agency ("LWDA");[4] and (4) an estimated $29,558.00 in settlement administration costs.  (Doc. 80-2 at 7; *see also* Doc. 80 at 2, 15; Doc. 80-1 ¶ 2.)

Assuming these allocations are awarded in full, approximately $225,442 (the "Net Settlement Amount" or "NSA") will be available for distribution to Settlement Class Members who submit a claim form and who do not submit a timely and valid election not to participate in the settlement ("Participating Class Members").  (Doc. 80-2 at 6; *see also* Doc. 80 at 16.)  The NSA shall be divided by the "Total Calendar Weeks," *i.e.*, the total number of calendar weeks worked by all Settlement Class Members during the Class Period, and the resulting number will be the "Calendar Week Value."  (Doc. 80-2 at 8.)  Each Participating Class Member's payment under the Settlement Agreement will be calculated by multiplying his or her number of calendar weeks worked during the Class Period by the Calendar Week Value.  (*Id.*)

PAGA Claim Members (whether or not they are Settlement Class Members or Participating Class Members) shall be allocated a *pro rata* portion of the $5,000 PAGA allocation ("Individual

---

[4] Pursuant to the PAGA, 75% of the civil PAGA penalties, or $15,000, will go to the LWDA, and 25%, or $5,000, will be allocated to the net settlement amount ("Net Settlement Amount" or "NSA").  (Doc. 80-2 at 7; *see also* Doc. 80 at 15.)  *See* Cal. Lab. Code § 2699(i).

PAGA Claim Payments"), which will be divided evenly between the PAGA Claim Members and added to the amount they will receive as Participating Class Member or will be sent separately for Settlement Class Members who have not filed a Claim Form or Class Members that have opted out of the Settlement.  (Doc. 80-2 at 9.)

The resulting sum of the two component payments for Class Members who are also PAGA Claim Members will equal each Participating Class Member's "Individual Settlement Payment." (Doc. 80-2 at 8.)  For Class Members who are not PAGA Claim Members, their Individual Settlement Payment will consist solely of the amount that is the product of their calendar weeks worked within the Class Period times the Calendar Week Value.  (*Id*.)  PAGA Claim Members who opt-out of the class settlement shall still receive their Individual PAGA payment, "since there is no right to opt-out of a PAGA settlement."  (*Id*.)

The settlement is "partially reversionary": only Participating Class Members will receive Settlement Payments and only PAGA Claims Members will be allocated and forwarded Individual PAGA Claim Payments, and those amounts not claimed, subject to a "50% floor" on distribution of the NSA.  (Doc. 80-2 at 6–7; *see also* Doc. 80 at 15–16.)  The 50% floor is defined as follows:

> Regardless of the specific amount or percentage of the NSA that is actually claimed, at least 50% of the NSA shall be distributed to Class members who submit timely claims.  If more than 50% of the NSA is claimed, then the actual amount claimed shall be distributed to the timely claimants, and only the amount of the NSA that remains unclaimed shall revert to Defendant.

(Doc. 80-2 at 7–8.)  Employer side payroll taxes are to be paid from any unclaimed funds above the 50% floor on distribution of the NSA.  (*Id*. at 7.)

Within 60 days after the notice is mailed, the Class Members will be required to accurately complete and sign a "Claim Form."  (Doc. 80-2 at 16–17.)  Settlement Class Members who do not properly or timely submit a Claim Form will not be entitled to any portion of the NSA (other than payments from the PAGA allocation), but will be bound by the release contained in the Settlement Agreement.  (*Id*. at 17.)

Assuming 100 percent participation, the average settlement amount per Participating Class Member will be approximately $40.99 ($225,442 ÷ 5,500).  Class Members who do not wish to

1   participate in the settlement or object thereto must give notice within 60 days of the Settlement

2   Administrator mailing out Notice Packets.  (Doc. 80-2 at 15–16.)  If 15 percent or more of the Class

3   Members opt-out of the settlement, Defendant may elect to rescind the settlement, such that the

4   settlement will become null and void.  (*Id*. at 9.)

5        Any checks to Participating Class Members that are not cancelled within 180 days from

6   issuance will be deemed void and the Individual Settlement Amount associated with the uncashed

7   check shall be deposited with the Department of Industrial Relations Unpaid Wages Fund in

8   California in the name of the Settlement Class Member or PAGA Claim Member who failed to

9   cash their check.  (Doc. 80-2 at 22.)

10                      **III.        LEGAL STANDARD**

11   **A.      Rule 23 Settlements**

12        Class actions require the approval of the district court before settlement.  Fed. R. Civ. P.

13   23(e) ("The claims, issues, or defenses of a certified class—or a class proposed to be certified for

14   purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the

15   court's approval.").  "Approval under 23(e) involves a two-step process in which the Court first

16   determines whether a proposed class action settlement deserves preliminary approval and then,

17   after notice is given to class members, whether final approval is warranted."  *Nat'l Rural*

18   *Telecomms. Coop. v. DIRECTV, Inc*., 221 F.R.D. 523, 525 (C.D. Cal. 2004).

19        The first step in the two-step process is preliminary approval.  During preliminary approval,

20   the court conducts a preliminary fairness evaluation to determine if notice of the class action

21   settlement should issue to class members and, if applicable, whether the proposed settlement class

22   should be certified.  *See* David F. Herr, *Ann. Manual Complex Lit.* § 21.632 (4th ed.).  Under Rule

23   23(e)(1), the court must direct notice to all class members who would be bound by the settlement

24   proposal if the parties show that "the court will likely be able to:" (i) approve the proposal under

25   Rule 23(e)(2)'s fair, reasonable, and adequate standard; and (ii) certify the proposed settlement

26   class.  Fed. R. Civ. P. 23(e)(1); *see also Lounibos v. Keypoint Gov't Sols. Inc*., No. 12-cv-00636-

27   JST, 2014 WL 558675, at *5 (N.D. Cal. Feb. 10, 2014) (quoting *In re Tableware Antitrust Litig*.,

28   484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)) (noting that federal courts generally grant

preliminary approval if "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval").

The second step is the final approval.  During final approval, "[i]f the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  In doing so, the court must consider several factors, including whether: "the class representatives and class counsel have adequately represented the class"; "the proposal was negotiated at arm's length"; "the proposal treats class members equitably relative to each other"; and "the relief provided for the class is adequate."  *Id*.  When considering whether "the relief provided for the class is adequate," the court should also consider:

(i)     the costs, risks, and delay of trial and appeal;

(ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)   the terms of any proposed award of attorney's fees, including timing of payment; and

(iv)    any agreement required to be identified under Rule 23(e)(3).

*Id*.  In addition to the two-step review process, Rule 23(e) also requires that: (i) the parties seeking approval file a statement identifying the settlement agreement; (ii) class members be given an opportunity to object; and (iii) no payment be made in connection with forgoing or withdrawing an objection, or forgoing, dismissing, or abandoning an appeal.  Fed. R. Civ. P. 23(e)(3), (5).

"Courts have long recognized that settlement class actions present unique due process concerns for absent class members."  *In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d 935, 946 (9th Cir. 2011) (internal quotation marks and citations omitted).  To protect the rights of absent class members, Rule 23(e) requires that the court approve such settlements "only after a fairness hearing and a determination that the settlement is fair, reasonable, and adequate."  *Id*. at 946.  When approval is sought of a settlement negotiated before formal class certification, "there is an even greater potential for a breach of fiduciary duty owed the class during settlement."  *Id*.  In such

circumstances, the "settlement approval requires a higher standard of fairness" and a "more exacting review" so as "to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Lane v. Facebook, Inc*., 696 F.3d 811, 819 (9th Cir. 2012) (internal quotation marks and citations omitted). Rule 23 also "demand[s] undiluted, even heightened, attention" to the certification requirements when class certification is sought only for purposes of settlement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).  Accordingly, the district court must examine the propriety of certification under Rule 23 both at this preliminary stage and at a later fairness hearing.  *See, e.g., Ogbuehi v. Comcast*, 303 F.R.D. 337, 344 (E.D. Cal. Oct. 2, 2014).

**B.    PAGA Settlements**

Under the PAGA, an "aggrieved employee" may bring an action for civil penalties for Labor Code violations on behalf of herself and other current or former employees.  Cal. Lab. Code § 2699(a).[5]  A plaintiff suing under the PAGA "does so as the proxy or agent of the state's labor law enforcement agencies." *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009). Thus, a judgment in a PAGA action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government." *Id*.

The PAGA statute imposes several limits on litigants.  First, because a PAGA action functions as a "substitute" for an action brought by the state government, a plaintiff suing under PAGA is limited to recovery of civil penalties only, rather than damages or unpaid wages available privately through direct or class action claims. *Iskanian v. CLS Transportation L.A., LLC*, 59 Cal. 4th 348, 381 (2014); *ZB, N.A. v. Superior Court*, 8 Cal. 5th 175, 182, 193 (2019), *rev'd in part on other grounds*, *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906 (2022).  Second, to bring an action under PAGA, an aggrieved employee must first provide written notice to the LWDA as well as to the employer.  Cal. Lab. Code § 2699.3(a)(1).  Third, any civil penalties recovered must be divided 75% with the LWDA and 25% with the aggrieved employees. *Id*. § 2699(i).  Fourth, and finally, the proposed settlement must be submitted to the LWDA, and a trial court must "review

---

[5] An "aggrieved employee" is defined as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." Cal. Lab. Code § 2699(c).

and approve" any settlement of PAGA claims.  *Id*. § 2699(l)(2); *see also Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 971 (N.D. Cal. 2019) (citation omitted) (noting that because settling a PAGA claim "compromises a claim that could otherwise be brought be the state," it requires that a court "review and approve any settlement of any civil action pursuant to [PAGA]").

Although there is no binding authority setting forth the proper standard of review for PAGA settlements, California district courts "have applied a Rule 23-like standard, asking whether the settlement of the PAGA claims is fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes." *Haralson*, 383 F. Supp. 3d at 972 (internal quotation marks omitted).  This standard is derived principally from the LWDA itself.  In commenting on a proposed settlement including both class action and PAGA claims, the LWDA offered the following guidance:

> It is thus important that when a PAGA claim is settled, the relief provided for under the PAGA be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, the court evaluate whether the settlement meets the standards of being "fundamentally fair, reasonable, and adequate" with reference to the public policies underlying the PAGA.

*O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) (citing the LWDA's guidance with approval).[6]  Recognizing the distinct issues presented by class actions, this Court is persuaded by the LWDA's reasoning in *O'Connor* and therefore adopts its proposed standard in evaluating the PAGA portion of the settlement now before the court.  *See, e.g., Castro v. Paragon Indus., Inc.*, No. 1:19-cv-00755-DAD-SKO, 2020 WL 1984240, at *6 (E.D. Cal. Apr. 27, 2020); *Patel v. Nike Retail Servs., Inc*., No. 14-cv-04781-RS, 2019 WL 2029061, at *2 (N.D. Cal. May 8, 2019).  Accordingly, the Court will approve a settlement of PAGA claims upon a showing that the settlement terms (1) meet the statutory requirements set forth by the PAGA; and (2) are fundamentally fair, reasonable, and adequate in view of the PAGA's public policy goals.

When a proposed settlement involves overlapping class action and PAGA claims, courts may employ a "sliding scale" in determining if the proposed settlement is "fundamentally fair, reasonable, and adequate with reference to the public policies underlying the PAGA." *O'Connor*,

---

[6] The LWDA has also stated that it "is not aware of any existing case law establishing a specific benchmark for PAGA settlements, either on their own terms or in relation to the recovery on other claims in the action." *O'Connor v. Uber Techs., Inc.*, No. 3:13-cv-03826-EMC (N.D. Cal. Jul. 29, 2016) (Doc. 736 at 2–3).

201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972 (following *O'Connor*); *McClure v. Brand Energy Serv.*, LLC, No. 2:18-cv-01726-KJM-AC, 2021 WL 2168149, at *10 (E.D. Cal. May 27, 2021) (same); *Cooks v. TNG GP*, No. 2:16-cv-01160-KJM-AC, 2020 WL 5535397, at *9–10 (E.D. Cal. Sept. 15, 2020) (same).  As the district court in *O'Connor* explained:

> For example, if the settlement for the Rule 23 class is robust, the purposes of PAGA may be concurrently fulfilled. By providing fair compensation to the class members as employees and substantial monetary relief, a settlement not only vindicates the rights of the class members as employees, but may have a deterrent effect upon the defendant employer and other employers, an objective of PAGA. Likewise, if the settlement resolves the important question of the status of workers as employees entitled to the protection of the Labor Code or contained substantial injunctive relief, this would support PAGA's interest in "augmenting the state's enforcement capabilities, encouraging compliance with Labor Code provisions, and deterring noncompliance."

*Id.* at 1134–1135 (quoting the LWDA's guidance).  At the same time, where "the compensation to the class amounts is relatively modest when compared to the verdict value, the non-monetary relief is of limited benefit to the class, and the settlement does nothing to clarify [aggrieved workers' rights and obligations], the settlement of the non-PAGA claims does not substantially vindicate PAGA."  *Id.* at 1135.  Finally, "where plaintiffs bring a PAGA representative claim, they take on a special responsibility to their fellow aggrieved workers who are effectively bound by any judgment."  *Id.* at 1134.  Plaintiff's special responsibility to other aggrieved workers is especially significant because the "PAGA does not require class action procedures, such as notice and opt-out rights."  *Id.*  Thus,

> [t]he Court must be cognizant of the risk that despite this responsibility, there may be a temptation to include a PAGA claim in a lawsuit to be used merely as a bargaining chip, wherein the rights of individuals who may not even be members of the class and the public may be waived for little additional consideration in order to induce the employer to agree to a settlement with the class.

*Id.*

## IV.   ANALYSIS

### A.   Preliminary Class Certification

On December 3, 2018, the Court granted preliminary certification of the proposed class

14

under Rule 23 and found that Plaintiff had satisfied Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation and Rule 23(b)(3)'s requirements of predominance and superiority.  (*See* Doc. 35.).  The Court will not revisit its analysis in this regard because the parties' proposed settlement class is materially identical to the class that was previously certified.  (*Compare* Doc. 35 at 19 *with* Doc. 80 at 15.)

The only difference is the Class Period which is extended from the date of class certification to the date of preliminary approval of the settlement.  (*See* Doc. 80 at 19.)  Accordingly, the Court will grant conditional certification of the settlement class as defined by the parties in the Settlement Agreement, as follows: "All current and former truck drivers employed by defendant Knight Transportation, Inc., who advised defendant that they resided in Oregon, Nevada, Arizona, Utah, and/or Colorado, who were paid in whole or in part on a piece-rate basis, and who drove one or more routes of five hours or more entirely within the State of California for defendant during the 'Class Period' from September 30, 2012 through [p]reliminary [a]pproval" of the settlement.  (Doc. 80 at 15; Doc. 80-2 at 5–6.)

**B.     Preliminary Settlement Approval**

Plaintiff also seeks preliminary approval of the settlement.  Under Rule 23(e), a court may approve a class action settlement only if it is a fair, reasonable, and adequate resolution of the dispute.  *Bluetooth*, 654 F.3d at 946.  "[P]reliminary approval of a settlement has both a procedural and substantive component." *Tableware Antitrust Litig*., 484 F. Supp. 2d at 1079 (citation omitted).  Preliminary approval of a settlement and notice to the proposed class is appropriate if: (1) the proposed settlement appears to be the product of serious, informed, non-collusive negotiations; and (2) the settlement falls within the range of possible approval, has no obvious deficiencies, and does not improperly grant preferential treatment to class representatives or segments of the class.  *Id*.

1.     Previously Expressed Concerns Regarding the Settlement

After having reviewed Plaintiff's renewed motion and its attachments, the Court finds that the parties have addressed its previously expressed concerns (*see* Doc. 79), as set forth below.

a.     "Opt-In" Process

Plaintiff has structured the Rule 23 class action to require class members to opt in and

15

submit a claim form if they wish to benefit from the settlement.  (Doc. 80-2 at 7, 16–17; *see also* Doc. 80 at 16–17.)  Previously, the Court pointed that it was not clear, and Plaintiff offered no explanation, why identifying information in the Defendant's possession could not be used to pay settlements directly to the class members who do not opt out of the Rule 23 class action.  (*See* Doc. 79 at 15–16.)  Plaintiff now explains that it cannot be accurately determined from Defendant's records, or any other source, which Class Members were harmed with respect to Plaintiff's surviving claim for unpaid inspection and detention time.  (*See* Doc. 80 at 20–21.)  Defendant's records do not always show when and where Class Members started their day or the amount of inspection time or detention time spent by each Class Member on each shift during the Class Period. (*See* Doc. 80-1 ¶ 36.)  Plaintiff further points out that even those Class Members who had instances of detention time do not always code detention time in their Department of Transportation (DOT) logs in the same way.  (*See id*.)  In view of this justification, the Court finds that the settlement's claims-made process does not render the settlement unfair.  *See, e.g, Moore v. Verizon Commc'ns Inc*., No. C 09-1823 SBA, 2013 WL 4610764, at *12 (N.D. Cal. Aug. 28, 2013) (rejecting challenge on fairness grounds to claims-made where class members were required to aver harm); *Pelletz v. Weyerhaeuser Co*., 255 F.R.D. 537, 544 (W.D. Wash. 2009) (approving claims-made process where class members were required to "answer two reasonable claim forms and submit a total of 10 photographs of the mold spotting.").

b.     *50% Floor and Reversion*

Plaintiff has clarified in his briefing that the "50% floor" aspect of the settlement requires Defendant to pay at least 50 percent of the NSA, with the remainder to revert to Defendant after the payment of employer-side payroll taxes from any unclaimed funds.  (Doc. 80 at 21.)  Thus, the maximum reversion to Defendant will be $112,721 minus any employer-side payroll taxes.  (*Id*.)

With respect to the reversion, the Ninth Circuit has counseled that "courts must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Bluetooth*, 654 F.3d at 947.  The Court is satisfied that, with the clarification of the 50 percent minimum distribution of the NSA, the reversionary nature of the claims-made settlement

militates against a finding of collusion.  *See, e.g., Clayton v. Knight Transp.*, No. 1:11-CV-00735-SAB, 2013 WL 5877213, at *12 (E.D. Cal. Oct. 30, 2013) (preliminarily approving reversionary claims-made settlement with 40 percent minimum distribution for the net settlement amount).  *See also Nur v. Tatitlek Support Servs., Inc.*, No. 15-CV-00094-SVW (JPRx), 2016 WL 3039573, at *3 (C.D. Cal. Apr. 25, 2016) ("[C]laims-made settlements, with a reversion of unclaimed funds to the employer are routinely approved by the Ninth Circuit and Courts in California.") (collecting cases).  So too does the fact that the settlement was reached with the involvement of a mediator experienced in wage and hour actions.  *See, e.g., Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA (EMC), 2012 WL 5878390, at *6 (N.D. Cal. Nov. 21, 2012) (use of private mediator to facilitate settlement "tends to support the conclusion that the settlement process was not collusive.").

*c.*    *Valuation of the Settlement*

i.    <u>Labor Code Claims</u>

In evaluating the fairness of a settlement award, "the settlement's benefits must be considered by comparison to what the class actually gave up by settling."  *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1123 (9th Cir. 2020) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968) ("Basic to [the] process [of evaluating settlements] . . . is the need to compare the terms of the compromise with the likely rewards of litigation.")).  However, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (citation omitted).  To determine whether a settlement "falls within the range of possible approval," a court must focus on "substantive fairness and adequacy" and "consider plaintiffs' expected recovery balanced against the value of the settlement offer."  *Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1080.

Plaintiff's counsel has submitted a revised declaration that substantiates a reduction, in light of the Ninth Circuit's decision in *Valiente*, of Defendant's maximum exposure from $4,066,426 to $2,259,520.  (*See* Doc. 80-1 at ¶¶ 21–23.)  With that reduction, the $400,000 GSA is now 17.7 percent, and the $225,442 NSA is now 9.9 percent, of the full verdict value of Plaintiff's claims—"within the range of possible approval."  *See, e.g., Singh v. Roadrunner Intermodal Servs., LLC*,

No. 1:15-cv-01497-DAD-BAM, 2018 WL 4382202 (E.D. Cal. Sept. 13, 2018) (approving a settlement of about 12% of the estimated maximum damages); *Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068, 2007 WL 221862, at *4 (N.D. Cal. Jan. 26, 2007) (approving a settlement of about 25–35% of the estimated maximum). The Court is further satisfied with Plaintiff's counsel's improved explanation of the risks of pursuing further litigation. For example, without a settlement Plaintiff would have to overcome Defendant's defenses, based on recent California Supreme Court and Ninth Circuit decisions, that (a) its pay policies were lawful and/or (b) the class should be decertified (*see* Doc. 80-1 ¶¶ 25, 27; *see also* Doc. 80 at 25–26, 27). *See Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (noting that "the risk of maintaining class action status throughout the trial" is one of the factors to be considered in evaluating the reasonableness of a settlement). Another viable defense, as identified by the Court in its certification order, is that California law may not apply to the certified class, which is comprised of non-resident drivers. (*See* Doc. 35 at 10–11; Doc. 80-1 ¶ 26; *see also* Doc. 80 at 26–27.) Plaintiff also points to the fact that courts "almost always award less than 100% of the available PAGA penalties," and emphasizes that the facts and circumstances of this case, particularly the recent state and federal court decisions that adversely affect the value of Plaintiff's underlying claims. (*See* Doc. 80-1 ¶ 28; *see also* Doc. 80 at 27–28.)

Based on the foregoing, the Court concludes that, considering the particular facts of this case, the approximately 82 percent discount on the verdict value of Plaintiff's class claims is reasonable. Defendant has robust legal and factual defenses that present enormous risks on the merits (as well as on the continued certifiability of a class action) to Plaintiff. Under these circumstances, Plaintiff's counsel reasonably concluded that the sharply discounted settlement presented the best possibility for recovery on behalf of the class—"in short, a deeply discounted recovery is better than the substantial likelihood of recovering nothing." *Viceral v. Mistras Grp., Inc.*, No. 15-CV-02198-EMC, 2016 WL 5907869, at *8 (N.D. Cal. Oct. 11, 2016) (approving settlement representing 8.1 percent of full verdict value in recognition of "daunting" risks plaintiffs faced in proving their case). *See also In re Uber FCRA Litig.*, No. 14-CV-05200-EMC, 2017 WL 2806698, at *7 (N.D. Cal. June 29, 2017) (approving settlement worth less than 7.5% of possible

verdict where class faced "substantial risks and obstacles" to prevailing at trial, as well as "the inevitable expense of litigating a large, complex case through trial.")

ii.  PAGA Claim

Plaintiff seeks to settle the PAGA claim for $20,000—75 percent paid to the LWDA and 25 percent to the Settlement Class—despite asserting its maximum value is $1,807,470.  This $1,807,470 amount makes up almost 80 percent of the total verdict value of the case.  Plaintiff proposes settling the PAGA claim for 1.1 percent of its estimated full worth.  The Court previously expressed concerns about that percentage, and noted that Plaintiff "provided no rationale for settling the PAGA claim for such a relatively meager value."  (*See* Doc. 79 at 19 (citing *O'Connor*, 201 F. Supp. 3d at 1133–34 (rejecting a proposal to settle PAGA claims for $1 million where counsel previously valued them at over $1 billion, noting the court's concern that the PAGA claim was being used "simply as a bargaining chip in obtaining a global settlement for Uber's benefit, even though the PAGA claim alone is worth more than half of the full verdict value of all claims being released.").)

However, "where a settlement for a Rule 23 class is robust, the statutory purposes of PAGA may be fulfilled even with a relatively small award on the PAGA claim itself, because such 'a settlement not only vindicates the rights of the class members as employees, but may have a deterrent effect upon the defendant employer and other employers, an objective of PAGA.'" *Viceral*, 2016 WL 5907869, at *9 (quoting *O'Connor*, 201 F. Supp. 3d at 1134).  The *O'Connor* court found that a settlement that allocated just 0.1 percent of the total value of the plaintiffs' PAGA claim did not fulfill the purpose of the statute.  201 F. Supp. 3d at 1135.  The court expressed concern that the LWDA had objected to the proposed allocation and noted that the PAGA claim was not subject to the same risk of forced arbitration that the court had found justified a deep discount on the plaintiffs' Labor Code claims.  *Id.*

Here, by contrast, the LWDA has taken no position on Plaintiff's proposed PAGA allocation (*see* Doc. 80-1 ¶¶ 49–50 & Doc. 80-5 (showing that Plaintiff provided notice through LWDA's online submission portal on November 10, 2021).  *See Jennings v. Open Door Marketing, LLC*, No. 15-cv-04080-KAW, 2018 WL 4773057, at *9 (N.D. Cal. Oct. 3, 2018) (approving 0.6

percent PAGA allocation where "[p]laintiffs [have] submitted the settlement agreement to the LWDA, and the LWDA has not objected to the settlement"); *Jordan v. NCI Grp., Inc.*, No. EDCV 16-1701 JVS (SPx), 2018 WL 1409590, at *3 (C.D. Cal. Jan. 5, 2018) (approving proposed PAGA allocation partly because "the LWDA was permitted to file a response to the proposed settlement and no comment or objection has been received").  Moreover, Plaintiff has now explained how his PAGA claim is subject to the same risks as his Labor Code claims, discussed above, plus the additional risk that the Court could discount any penalties awarded at trial pursuant to Cal. Labor Code § 2699(e)(2).  Where a deeply discounted settlement reflects the same risk for Labor Code and PAGA claims, courts have approved lower PAGA allocations.  *See, e.g., Viceral*, 2016 WL 5907869, at *9 (approving 0.15 percent PAGA allocation after finding that total settlement, though worth just 7.2 percent of full verdict value, was reasonable); *Jennings*, 2018 WL 4773057, at *7, 9 (approving 0.6 percent PAGA allocation after finding that deeply discounted settlement reflected "significant risk that further litigation would lead to lower or likely even no recovery").

For these reasons, the Court finds that the settlement's proposed PAGA allocation, also falls within a reasonable range of recovery.

### iii.   Summary

In light of the foregoing, the Court concludes that Plaintiff has made an adequate showing sufficient to warrant a preliminary finding that the proposed settlement amount and allocation is fair, reasonable, and adequate.

### d.   *Incentive Award*

Plaintiff also requests that the Court approve an incentive payment in an amount of $10,000 to be awarded to Robert Martinez as named plaintiff (the "Incentive Award").  (Doc. 80-2 at 7, 11–12.)

A district court may award incentive payments to named plaintiffs in class action cases. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009).  The purpose of incentive awards is to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaking in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general."  *Id*.  To justify an incentive award, a class

20

representative must present "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc*., 252 F.R.D. 652, 669 (E.D. Cal. 2008).  Such incentive awards are particularly appropriate in wage-and-hour actions where a plaintiff undertakes a significant reputational risk in suing their employer.  *Rodriguez*, 563 F.3d at 958–59.

The Ninth Circuit has emphasized, however, that "district courts must be vigilant in scrutinizing all incentive awards."  *Radcliffe v. Experian Info. Sols., Inc*., 715 F.3d 1157, 1165 (9th Cir. 2013) (internal quotation marks and citation omitted).  In keeping with that admonition, district courts have declined to approve incentive awards that represent an unreasonably high proportion of the overall settlement amount or are disproportionate relative to the recovery of other class members.  *See Ontiveros v. Zamora*, 303 F.R.D. 356, 365–66 (E.D. Cal. 2014) (finding an incentive award of $20,000, comprising 1% of the common fund, to be excessive under the circumstances, and reducing the award to $15,000, where class representative spent 271 hours on the litigation and relinquished the opportunity to bring several of his own claims in order to act as class representative); *see also Ko v. Natura Pet Prods., Inc*., No. C 09–2619 SBA, 2012 WL 3945541, at *15 (N.D. Cal. Sept. 10, 2012) (holding that an incentive award of $20,000, comprising one percent of the approximately $2 million common fund was "excessive under the circumstances" and reducing the award to $5,000); *Wolph v. Acer Am. Corp.*, No. C 09–01314 JSW, 2013 WL 5718440, at *6 (N.D. Cal. Oct. 21, 2013) (reducing the incentive award to $2,000 where the class representatives did not demonstrate great risk to finances or reputation in bringing the class action).  In reducing the award, courts have noted that overcompensation of class representatives could encourage collusion at the settlement stage of class actions by causing a divergence between the interests of the named plaintiff and the absent class members, destroying the adequacy of class representatives.  *See Staton v. Boeing Co.*, 327 F.3d 938, 977–78 (9th Cir. 2003); *see also Radcliffe*, 715 F.3d at 1165.

The Court previously observed that the proposed $10,000 Incentive Award "appear[ed] to be excessive under the circumstances of the case," as it is "two times the amount that the Ninth

Circuit has considered reasonable." (Doc. 79 at 22) (citing *Resnick v. Frank (In re Online DVD–Rental Antitrust Litig.)*, 779 F.3d 934, 947 (9th Cir. 2015).)   The Court further noted that the Incentive Award "constitutes 2.5 percent of the GSA and is almost 250 times higher than the estimated average payment for the other class members." (*Id*. at 22–23 (*citing Sandoval v. Tharaldson Emple. Mgmt.*, No. EDCV 08-482-VAP (OPx), 2010 WL 2486346, at *9–10 (C.D. Cal. June 15, 2010) (collecting cases and concluding that plaintiff's request for an incentive award representing one percent of the settlement fund was excessive).)   Plaintiff was advised that should he "renew his request for an incentive award that amounts to a similarly high proportion of the overall settlement amount or is disproportionate relative to the recovery of other class members, he must provide clear and specific evidence demonstrating significant contributions to the litigation of this case." (*Id*. at 23.)

In his amended declaration, Plaintiff represents he has expended approximately 82 hours in connection with this case, including: participating in several lengthy interviews and phone conferences over a period lasting several months; searching for and producing a significant amount of relevant documents; reviewing pleadings in the case; consulting with counsel on factual issues; reviewing documents and data provided by Defendant; communicating about the case with Class Members; providing multiple declarations; reviewing and approving the mediation brief and settlement agreement; and participating in an all-day mediation. (Doc. 80-5 ¶¶ 5–16.)   Plaintiff also notes that he undertook a significant reputational risk by suing Defendant. (*Id*. at ¶ 19.)   In view of the foregoing, the Court finds that the requested amount is reasonable and is approved on a preliminary basis. *See, e.g., Larson v. Harman-Mgmt. Corp*., No. 116CV00219DADSKO, 2019 WL 7038399, at *6 (E.D. Cal. Dec. 20, 2019) (preliminarily approving a $10,000 incentive payment that was "significantly higher than the average recovery amount of individual class members," noting that "courts in this circuit have approved enhancement awards in this amount, and such an award here would not necessarily be 'outside the realm of what has been approved as reasonable by other courts.'") (quoting *Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 2214936, at *8 (E.D. Cal. May 19, 2017) (collecting cases)).

1

*e.*      *Class Notice*

2    For proposed settlements under Rule 23, "the court must direct notice in a reasonable

3  manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1); *see*

4  *also Hanlon*, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement

5  under Rule 23(e).").  Due process also requires that any class member bound by a class action

6  settlement, at a minimum, be afforded the opportunity "to remove himself from the class."  *Ortiz*

7  *v. Fibreboard Corp.*, 527 U.S. 815, 848 (1999) (citation and internal quotation marks omitted).

8    For a class certified under Federal Rule of Civil Procedure 23(b)(3), the notice must contain,

9  in plain and clear language: (1) the nature of the action; (2) the definition of the class certified; (3)

10  the class claims, issues, or defenses; (4) the right of a class member to appear through an attorney,

11  if desired; (5) the right to be excluded from the settlement; (6) the time and manner for requesting

12  an exclusion; and (7) the binding effect of a class judgment on members of the class.  Fed. R. Civ.

13  P. 23(c)(2)(B).  A class action settlement notice "is satisfactory if it generally describes the terms

14  of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to

15  come forward and be heard."  *Churchill Vill.*, 361 F.3d at 575 (internal quotation marks and

16  citations omitted).

17    Here, the Settlement Agreement provides that the Settlement Administrator will receive a

18  list identifying each Class Member, culled from Defendant's business records.  (Doc. 80-2 at 14.)

19  Within thirty days following preliminary approval, the Settlement Administrator will send the

20  Notice to all Class Members via first-class mail.  (*Id.* at 15.)  For mailings returned as undeliverable,

21  the Settlement Administrator will perform a "computer/SSN and 'skip trace' search to attempt to

22  obtain an updated address," and will remail the Notice to all class members for whom new addresses

23  are found.  (*Id.* at 16.)  In addition, the Settlement Administrator will process any claims, opt-out

24  requests and objections to the settlement.  (*Id.* at 16–19.)  The Court had previously expressed

25  concern that the settlement was deficient, in that the manner of providing notice to the Class did

26  not exclude from it any Class Member whose Notice is returned as undeliverable by the post office,

27  citing *Sanchez v. Frito-Lay, Inc*., No. 1:14-CV-00797-AWI-MJS, 2015 WL 4662636, at *12  (E.D.

28  Cal. Aug. 5, 2015).  (*See* Doc. 79 at 23–24.)  Ultimately, in *Sanchez*, the Court was satisfied by the

1    class notice and did not require any further amendment.  *See Sanchez v. Frito-Lay, Inc.*, No. 1:14-

2    CV-00797-DAD-BAM, 2019 WL 4828775, at *13 (E.D. Cal. Sept. 30, 2019) ("[T]he proposed

3    mail delivery is also appropriate . . . .").

4         As Plaintiff points out in its renewed motion, the Settlement Agreement also provides a

5    detailed method of contacting Class Members in the event the original Notice is returned as

6    undeliverable.  (*See* Doc. 80 at 32–33.)  In that circumstance, courts have found the class notice

7    sufficient.  *See Chun-Hoon v. McKee Foods Corp*., No. C 05-0620 VRW, 2009 WL 3349549, at

8    *3 (N.D. Cal. Oct. 15, 2009) ("Because the proposed notice provides for detailed methods of

9    contacting both former and current distributors in the event that the original mailings are returned

10   as undeliverable, the court finds that such notice is appropriate in this case.")  *Cf. Lounibos,* 2013

11   WL 3752965, at *6 (finding settlement agreement did not "afford[] minimum due process to each

12   of the putative class members" where it did not provide for a method of obtaining updated address

13   information from class members whose first notice was returned undeliverable by the post office.).

14        Turning to the substance of the Notice (Doc. 80-2 at 15–16, 34–41), it (1) describes the

15   nature of the lawsuit and claims at issue, (2) defines the class, (3) explains the amount of the

16   settlement and how individual Class Member settlement payments will be calculated, (4) discloses

17   all deductions that will be requested from the settlement for fees, costs, service awards, and

18   settlement administration expenses, (5) details the claims that are being released, (6) explains how

19   an individual can request exclusion from the Class, (7) explains how a Class Member can object to

20   the settlement, (8) provides a procedure for challenging the calculation of weeks worked, (9)

21   discloses the time and place of the final approval hearing, and (10) displays the contact information

22   for class counsel and advises that they may be contacted to answer questions about the settlement.

23   (*See id*.)  The Notice does not reference or describe the "Withdrawal Option" section of the

24   Settlement Agreement, under which Defendant retains the right to void the settlement if more than

25   15 percent of the Class Members opt-out of the settlement.[7]

---

26   [7] Considering relevant case law, the Court preliminarily deems this "blow up" provision reasonable, fair, and adequate.
27   *See Dynabursky v. Alliedbarton Security Services, LP*, No. 8:12-cv-02210-JLS-RNB, 2016 WL 8921915, at *13, *2
     n.1 (C.D. Cal. Aug. 15, 2016) (granting preliminary approval of a settlement agreement involving a blow up clause
     with a 10% opt-out threshold); *Four In One Co., Inc. v. S.K. Foods, L.P*., No. 2:08-cv-03017-KJM-JDP, 2014 WL
28   28808, at *8, *14 (E.D. Cal. Jan. 2, 2014) (granting preliminary approval of a settlement agreement involving a blow

The Court finds that the notice and the manner of notice proposed by Plaintiff meets the requirements of Federal Civil Procedure Rule 23(c)(2)(B) and, considering Plaintiff's updated briefing, that the proposed mail delivery procedure is appropriate under these circumstances.

2. Previously Unaddressed Aspects of the Settlement

a. Attorney's Fees

When a negotiated class action settlement includes an award of attorney's fees, the district court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941; *see also Knisley v. Network Assocs., Inc.*, 312 F.3d 1123, 1125 (9th Cir. 2002) (citation omitted). Where, as here, fees are to be paid from a common fund, the relationship between the class members and class counsel "turns adversarial." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) (citation omitted). As a result, the district court must assume a fiduciary role for the class members and "act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is." *Id.* (internal quotation marks and citations omitted).

In evaluating the award of attorney's fees, "courts have discretion to employ either the lodestar method or the percentage-of-recovery method." *Bluetooth*, 654 F.3d at 942 (citations omitted). Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

Under the percentage of the fund method, the court may award class counsel a percentage of the common fund recovered for the class; in the Ninth Circuit, the benchmark is 25%. *Id.* at 1007, 1047–48; *see also Bluetooth*, 654 F.3d at 942. Special circumstances that could justify

---

up clause with a 25% opt-out threshold); *del Toro Lopez v. Uber Technologies, Inc.*, No. 4:17-cv-06255-YGR, 2018 WL 5982506, at *25 (N.D. Cal. Nov. 14, 2018) (granting final approval of settlement agreement involving a blow up clause with a 5% opt-out threshold); *Jones v. Canon Business Solutions, Inc.*, No. 2:12-cv-07195-JAK-JEM, 2014 WL 12772083, at *5, *16 (C.D. Cal. Sept. 2, 2014) (granting final approval of a settlement agreement involving a blow up clause with a 10% opt-out threshold); *see also Medina v. NYC Harlem Foods Inc.*, No. 1:21-cv-01321-VSB, 2022 WL 1184260, at *6 (S.D.N.Y. Apr. 21, 2022) ("Blow-up provisions thus encourage settlement by allowing defendants to limit their potential liability. Blow up provisions also give plaintiff's counsel leverage to negotiate the strongest possible settlement to discourage opt outs.") (internal citation omitted).

varying the benchmark award include when counsel achieves exceptional results for the class, undertakes extremely risky litigation, generates benefits for the class beyond simply the cash settlement fund, or handles the case on a contingency basis. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015). An explanation is necessary when the court departs from the 25% benchmark, *Powers v. Eichen*, 229 F.3d 1249, 1256–57 (9th Cir. 2000), but either way, "[s]election of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002).

With the lodestar method, the court multiples the number of hours the prevailing party reasonably spent litigating the case by a reasonable hourly rate for counsel.[8] *Bluetooth*, 654 F.3d at 941. The product of this computation, the "lodestar" amount, yields a presumptively reasonable fee. *See Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013).

The Ninth Circuit has recommended that district courts apply one method but cross-check the appropriateness of the determined amount by employing the other as well. *See Bluetooth*, 654 F.3d at 944. This diligence is particularly important "when counting all hours expended" in a case "where the plaintiff has achieved only limited success" would yield an "excessive amount" of fees, or when awarding a percentage of a "megafund would yield windfall profits for class counsel in light of the hours spent on the case." *Bluetooth*, 654 F.3d at 942 ("Just as the lodestar method can confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate, the percentage-of-recovery method can likewise be used to assure that counsel's fee does not dwarf class recovery.") (internal quotation marks and citations omitted). Similarly, an upward adjustment could be justified if the recovery is "too small . . . in light of the hours devoted to the case or other relevant factors." *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

---

[8] When a case is filed in this Court, "[t]he Eastern District of California, Fresno Division, is the appropriate forum to establish the lodestar hourly rate." *See Jadwin v. County of Kern*, 767 F.Supp.2d 1069, 1129 (E.D. Cal. 2011). A court may apply "rates from outside the forum . . . . 'if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case.'" *Barjon v. Dalton*, 132 F.3d 496 (9th Cir. 1997) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992))

Here, the settlement provides that class counsel will seek an award of 25% of the GSA, equivalent to $100,000.[9] (Doc. 80-2 at 11.) This fee amount is consistent with the benchmark rate in the Ninth Circuit. *See Bluetooth*, 654 F.3d at 947. According to Plaintiff's counsel, the lodestar method yields a result of approximately $335,000, substantially greater than the $100,000 request. (*See* Doc. 80-1 ¶¶ 38–41; Doc. 80-3.) As such, the Court will approve the attorney's fee request on a preliminary basis. However, in connection with the final fairness determination, the Court will consider any objections as well as updated lodestar evidence presented by counsel to determine whether the fee award of 25% is reasonable in this case.

### b.    Release of Claims

Class action settlement agreements cannot release claims of absent class members that are unrelated to the factual allegations of the class complaint. *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010). Here, the Settlement Agreement provides that all Class Members who do not timely file a claim or opt-out of the settlement will be deemed to have released Defendant from the Released Claims, which are "limited to those based on the factual allegations in Plaintiff's operative Complaint." (Doc. 82-1 at 23–24.) As such, the settlement does not release unrelated claims that Class Members may have against Defendant. The Court therefore finds that the scope of the release is satisfactory. *See Hesse*, 598 F.3d at 590. *See also Collins v. Cargill Meat Solutions Corp.*, 274 F.R.D. 294, 303 (E.D. Cal. 2011) (finding adequate a release that was limited to "the Covered Claims based on the facts alleged in the Second Amended Complaint [ ] filed in the Lawsuit"); *id.* (noting that the released claims "appropriately track the breadth of Plaintiffs' allegations in the

---

[9] The settlement also provides for up to $20,000 in litigation costs. (Doc. 80-2 at 11.) Plaintiff's counsel have not submitted a list of litigation expenses incurred thus far, nor any information that supports the $20,000.00 request. (*See* Doc. 80-1 ¶ 42.) Although this amount of costs is not *per se* unreasonable for counsel to have accrued in litigating a class action, *see, e.g., Castro*, 2020 WL 1984240, at *3, 19 (granting preliminary approval of a proposed settlement providing for up to $55,000.00 in litigation costs), the Court is not able to conclude on the evidence currently before it that an award of up to $20,000.00 is reasonable and necessary here. Given the proceedings in this action, which include the filing of a motion to transfer venue, a motion for class certification, and two motions for preliminary approval, the Court finds that documented litigation costs of up to $10,000 would likely be fair, reasonable, and adequate for the purposes of preliminary approval. *See, e.g., Alberto v. GMRI, Inc.*, No. 2:07-cv-01895-WBS-DAD, 252 F.R.D. 652, 665 (E.D. Cal. 2008) (granting preliminary approval of a class action settlement in which $10,000 of the $435,000 settlement fund would be allocated to documented litigation costs, but requiring class counsel to submit an application for reimbursement of costs). Nonetheless, Plaintiff's counsel are directed to provide an accounting for the requested $20,000.00 in litigation costs in seeking final approval of the settlement. At that time, the court will carefully re-examine the amount of litigation costs to be awarded as part of the settlement.

action and the settlement does not release unrelated claims that class members may have against defendants"); 4 NEWBERG ON CLASS ACTIONS (4th Ed. 2002) § 12:15, pp. 310–311 ("A clause providing for the release of claims may refer to all claims raised in the pending action, or it may refer to all claims, both potential and actual, that may have been raised in the pending action with respect to the matter in controversy.").

### C.    Settlement Administrator and Settlement Administration Costs

The parties have agreed to retain Atticus Administration, LLC to handle the notice and claim administration process.  (Doc. 80-1 at ¶ 48.  *See also* Doc. 80 at 16.)

The estimated cost of administering this settlement is "not to exceed $29,558," which will be deducted from the Gross Settlement Amount.  (Doc. 80-1 at ¶ 48.  *See also* Doc. 80-4 at 4.)  This estimate is consistent with, and in some cases lower than, other settlements submitted to this court. *See, e.g*., *Lusk v. Five Guys Enterprises LLC,* No. 1:17-cv-00762-AWI-EPG, 2022 WL 4791923, at *9 (E.D. Cal. Sept. 30, 2022) (administration costs of $30,000 for a $1.2 million settlement); *Razo v. AT&T Mobility Servs., LLC*, No. 1:20-cv-0172-JLT -HBK, 2022 WL 4586229, at *17 (E.D. Cal. Sept. 29, 2022) (administration costs of $30,000 for a $575,000 settlement); *Dakota Med., Inc. v. RehabCare Grp., Inc*., No. 1:14-cv-02081-DAD-BAM, 2017 WL 1398816, at *5 (E.D. Cal. Apr. 19, 2017) (administration costs of $94,000 for a $25 million settlement); *Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 117789, at *7 (E.D. Cal. Jan. 11, 2017) (administration costs of $45,000 for a $4.5 million settlement).

Accordingly, the court will appoint Atticus Administration, LLC as the Settlement Administrator.

### D.    Implementation Schedule

The Settlement Agreement sets forth an implementation schedule that may be summarized by the following table:

| Event | Date |
|---|---|
| Deadline for the Settlement Administrator to send a Notice Packet to each Class Member | Thirty (30) days after preliminary approval of the settlement |

| Deadline to file a Claim Form, Opt-Out Letter, objection to the Settlement, or a dispute related to the stated number of calendar weeks worked during the Settlement Class Period | Sixty (60) days after the initial mailing of the Notice Packet (the "Response Deadline") |
| --- | --- |
| Deadline for Settlement Administrator to provide counsel with a report listing the number of Class Members and PAGA Claim Members who received Notice, the number of Settlement Class Members and PAGA Claim Members, the number of Participating Class Members, the number and names of those Class Members who submitted opt-out notices, the total amount of all Individual Settlement Payments to be made to Settlement Class Members, the total amount of all Individual PAGA Claim Payments to be made to the PAGA Claim Members, and the average and maximum Individual Settlement Payments and Individual PAGA Claim Payments | Seven (7) days after the Response Deadline |
| Deadline for Defendant to deposit with Settlement Administrator the Settlement Funds | Thirty (30) days after Effective Date, as defined in the Settlement Agreement (the "Deposit Date") |
| Deadline for Settlement Administrator to issue checks to Class and PAGA claimants | Fifteen (15) days after the Deposit Date |
| Deadline for recipients to cash Settlement Checks | One hundred eighty days (180) from the date of mailing |
| Deadline for Class Counsel to provide to the Court a declaration by the Settlement Administrator of due diligence and proof of mailing of the Notice Packets | Fourteen (14) days prior to the final approval hearing |

(*See* Doc. 80-2 at 12, 13, 14, 16, 18, 21, 22, 34, 38, 41.)  The Court approves this schedule and will set the Final Approval Hearing for September 20, 2023, at 9:30 am in Courtroom 7 (SKO) to allow adequate time for the foregoing events to take place.

## V.    CONCLUSION AND ORDER

For the reasons stated above, IT IS HEREBY ORDERED THAT:

1.     Plaintiff's renewed motion for preliminary approval of a class action settlement and conditional certification of settlement class (Doc. 80) is granted;

2.     The hearing on Plaintiff's renewed motion, set for March 29, 2023, is vacated;

3. The proposed class identified in the Settlement Agreement (Doc. 80-2 at 5–6) is certified for settlement purposes;

4. Plaintiff's counsel, Craig J. Ackermann of Ackerman & Tilajef, P.C. and Julian Hammond of HammondLaw, P.C., are appointed as class counsel for settlement purposes;

5. The named plaintiff Robert Martinez is appointed as class representative for settlement purposes;

6. Atticus Administration, LLC is approved as the settlement claims administrator;

7. The proposed notice (Doc. 80-2 at 34–41) is approved in accordance with Federal Rule of Civil Procedure 23;

8. The proposed settlement (Doc. 80-2 at 2–32, as amended, Doc. 82-1 at 2–32) detailed herein is approved on a preliminary basis as fair and adequate;

9. The hearing for final approval of the proposed settlement is set for **September 20, 2023, at 9:30 a.m**. before Magistrate Judge Sheila K. Oberto in Courtroom 7, with the motion for final approval of class action settlement to be filed at least 35 days in advance of the final approval hearing, in accordance with Local Rule 230(b);

10. Among other things the parties deem appropriate, the parties are directed to provide the Court with the information in footnote 9 in connection with Plaintiff's motion for final approval of class action settlement; and

11. The settlement implementation schedule set forth above is adopted.

IT IS SO ORDERED.

Dated:   **March 24, 2023**      */s/ Sheila K. Oberto*
            UNITED STATES MAGISTRATE JUDGE