1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ROBERT MARTINEZ, an individual, on          No.  1:16-cv-01730-SKO
     behalf of himself and all others similarly
12   situated,                                   **ORDER VACATING HEARING AND
                                                 GRANTING MOTION FOR FINAL
13                   Plaintiff,                  APPROVAL OF CLASS ACTION
                                                 SETTLEMENT AND GRANTING
14            v.                                 MOTION FOR ATTORNEY'S FEES AND
                                                 COSTS**
15   KNIGHT TRANSPORTATION, INC. dba
     ARIZONA KNIGHT                              (Docs. 88 & 89)
16   TRANSPORTATION, INC.,

17                   Defendant.

18

19        Pending before the Court is Plaintiff's motion for final approval of a class action settlement

20   and motion for attorney's fees and costs.  (Docs. 88 & 89.)  No objections to the proposed settlement

21   terms were received by the settlement administrator (*see* Doc. 89 at 9, 18) or filed with the Court.

22   Accordingly, the hearing for the motions, currently set for September 20, 2023, will be vacated.

23        For the reasons set forth below, the Court will grant final approval of the class action

24   settlement and will grant the motion for attorney's fees and costs.

25                         **I.        BACKGROUND**

26        The Court previously summarized Plaintiff's allegations in its March 27, 2023, order

27   granting Plaintiff's motion for preliminary approval of a class action settlement and conditional

28

                                              1

1    class certification (Doc. 84), and will not repeat the factual background in this order.  Following

2    the grant of preliminary approval in this action, on July 14, 2023, Plaintiff filed the pending motion

3    for attorney's fees and costs (Doc. 88), and on August 16, 2023, Plaintiff filed the pending motion

4    for final approval of the parties' class action settlement (Docs. 89).  In support of the motions,

5    Plaintiff has submitted declarations from class counsel and the settlement administrator in this

6    action.  (Docs. 88-1, 88-4, 89-1, 89-2.)  As of the date of this order, no objections to the settlement

7    were received by the settlement administrator or filed with this Court, and no class members have

8    opted out of the settlement.  (*See* Doc. 89-2 ¶ 12.  *See also* Doc. 89 at 9, 18.)  Defendant did not

9    oppose either motion.

10        Under the proposed settlement, Defendant will pay a total of $400,000 (the "Gross

11    Settlement Amount" or "GSA").  (Doc. 89 at 8, 15; Doc. 89-2 ¶ 14; Doc. 89-3 at 5; Doc. 89-6 at

12    6.)  Assuming the parties' proposed allocations are awarded in full, $227,152.69 (the "Net

13    Settlement Amount" or "NSA") will be available for distribution to participating settlement class

14    members.  (Doc. 89 at 8; Doc. 89-2 ¶ 16; Doc. 89-6 at 6–7.)

15                        **II.        FINAL CERTIFICATION OF SETTLEMENT CLASS**

16        On December 3, 2018, the Court granted certification of the proposed class under Rule 23

17    and found that Plaintiff had satisfied Rule 23(a)'s requirements of numerosity, commonality,

18    typicality, and adequacy of representation and Rule 23(b)(3)'s requirements of predominance and

19    superiority.  (*See* Doc. 35.)

20        The Court's findings on these issues have not changed, and no objections to class

21    certification were raised.  Accordingly, there is no need for the Court to repeat the analysis on these

22    issues here.  *See, e.g., Harris v. Vector Marketing*, No. C–08–5198 EMC, 2012 WL 381202 at *3,

23    at *7 (N.D. Cal. Feb. 6, 2012) ("As a preliminary matter, the court notes that it previously certified

24    . . . a Rule 23(b)(3) class . . . . [Thus, it] need not analyze whether the requirements for certification

25    have been met and may focus instead on whether the proposed settlement is fair, adequate, and

26    reasonable."); *In re Apollo Group Inc. Securities Litigation*, No. CV 04-2147-PHX-JAT, 2012 WL

27    1378677 at *4 (D. Ariz. Apr. 20, 2012) ("The Court has previously certified, pursuant to Rule 23[,]

28    . . . and hereby reconfirms its order certifying a class").

The Court hereby confirms its prior order and certifies the following class (the "Class") of 5,648 individuals (the "Settlement Class Members" or "Settlement Class"): "All current and former truck drivers employed by defendant Knight Transportation, Inc., who advised defendant that they resided in Oregon, Nevada, Arizona, Utah, and/or Colorado, who were paid in whole or in part on a piece-rate basis, and who drove one or more routes of five hours or more entirely within the State of California for defendant during the 'Class Period' from September 30, 2012 through [p]reliminary [a]pproval" of the settlement, or March 27, 2023.  (Doc. 84 at 14–14; Doc. 89 at 10 Doc. 89-2 ¶¶ 4–5; Doc. 89-3 at 5.)  In addition, for the reasons stated in the certification order and the order of preliminary approval, Plaintiff Robert Martinez is confirmed as class representative; Ackermann & Tilajef, P.C. and HammondLaw, PC are confirmed as co-class counsel; and Atticus Administration, LLC ("Atticus") is confirmed as the settlement administrator.  (Doc. 35 at 8, 19–20; Doc. 84 at 28.)

## III.  FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Class actions require the district court's approval prior to settlement.  Fed R. Civ. P 23(e).  To approve a settlement, a district court must: (i) ensure notice is sent to all class members; (ii) hold a hearing and make a finding that the settlement is fair, reasonable, and adequate; (iii) confirm that the parties seeking approval file a statement identifying the settlement agreement; and (iv) be shown that class members were given an opportunity to object.  Fed. R. Civ. P. 23(e)(1)–(5).  The parties filed the settlement agreement on March 7, 2023 (Doc. 82-1), and Class Members were given an opportunity to object on or before July 25, 2023.  (Doc. 89-2 ¶ 9; 89-4.)  Neither Atticus nor the Court received any objections, timely or otherwise, to the settlement.  (Doc. 89-2 ¶ 12; *see also* Doc. 89 at 9, 18.)  The Court now turns to the adequacy of notice and its review of the settlement following the final fairness hearing.

### A.  Notice

Adequate notice of the class settlement must be provided under Rule 23(e).  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998); *see also Silber v. Mabon*, 18 F.3d 1449, 1453–54 (9th Cir. 1994) (noting that the court need not ensure all class members receive actual notice, only that "best practicable notice" is given); *Winans v. Emeritus Corp.*, No. 4:13-cv-03962-HSG,

2016 WL 107574, at *3 (N.D. Cal. Jan. 11, 2016) ("While Rule 23 requires that 'reasonable effort' be made to reach all class members, it does not require that each individual actually receive notice."). "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (quoting *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1352 (9th Cir. 1980)). Any notice of the settlement sent to the class should alert class members of "the opportunity to opt-out and individually pursue any state law remedies that might provide a better opportunity for recovery." *Hanlon*, 150 F.3d at 1025.

The Court previously reviewed the notice provided in this case at the preliminary approval stage and found it to be satisfactory. (Doc. 84 at 23–25.) Class counsel filed the declaration of Bryn Bridley of Atticus in support of the motion for final approval and fee motion. (Doc. 82-2.) Following the grant of preliminary approval, on May 1, 2023, Atticus received the class data file from defense counsel, which contained the names, addresses, social security numbers, telephone numbers, hire dates and termination dates of 5,652 truck drivers who are current or former employees of Defendant who advised Defendant that they resided in Oregon, Nevada, Arizona, Utah or Colorado, were paid in whole or in part on a piece-rate basis, and drove one or more routes of five hours or more entirely within the State of California during the class period. (Doc. 89-2 ¶ 4.) The final Class List included 5,648 Settlement Class Members. (*Id*. ¶ 5.) Atticus further determined that 3,866 of the Settlement Class Members on the class list were California-based drivers who worked any time from September 27, 2015, through March 27, 2023 (the "PAGA Class Period"). (*Id*.)

In preparation for mailing, the class list was processed against the National Change of Address ("NCOA") database, maintained by the United States Postal Service ("USPS"), for purposes of updating and confirming the mailing addresses of the Class Members before mailing the notice packets. (Doc. 89-2 ¶ 6.) The NCOA contains updated addresses for any individual who had moved in the previous four years and notified the USPS of their change of address. (*Id*.)

On May 26, 2023, Atticus mailed the notice packets via U.S. First Class Mail to the 5,648 individuals contained in the class list. (Doc. 89-2 ¶ 7.) A copy of the notice packet is attached to

4

the declaration of Bryn Bridley as an exhibit.  (*See* Doc. 89-3.)  The notice packet informed Class Members of the terms of the Settlement and included procedures on how to complete a claim form, request exclusion, challenge the number of weeks of employment during the Class Period, and how to object.  (Doc. 89-2 ¶ 8.  *See also* Doc. 89-3.)  The notice packet also advised Settlement Class Members of applicable deadlines and other events, such as the final approval hearing, how and where to obtain additional settlement information, and of class counsel's request for fees and expenses and an award for the named Plaintiff.  (*See id*.)

On June 1, 2023, Atticus discovered that the prior notice packets included deadlines calculated according to what the mail date would have been prior to the Court's entry of an order (Doc. 86) granting Defendant's request to continue class deadlines (Doc. 85).  (Doc. 89-2 ¶ 9.)  Atticus notified the parties immediately and a corrective notice in the form of a postcard was promptly prepared for mailing to inform Class Members of the error and the actual deadline by which claims, exclusion requests, and objections.  (*Id*.)  A copy of the corrected postcard notice is attached to the declaration of Bryn Bridley as an exhibit.  (*See* Doc. 89-4.)

Of the 5,648 notice packets mailed, 2,039 were returned to Atticus as undeliverable.  (Doc. 89-2 ¶ 10.)  Thirty-two (32) of the undeliverable pieces included forwarding information and the notice packets were promptly remailed to the forwarding addresses.  (*Id*.)  One thousand nine hundred twenty-six (1,926) of the remaining 2,007 undeliverable records were sent to a professional search firm for address tracing.  (*Id*.)  New addresses were received for 1,836 of the traced records and were not received for 90 records.  (*Id*.)  Two hundred thirty-four (234) of the remailed Notices were returned a second time, and 81 were not sent to trace for updates because they were received after the exclusion, objection, and dispute deadline.  (*Id*.)  In total, 5,243 or 92.83% of the Notices dispersed were successfully mailed and 405 Class Members ultimately did not receive the mailed notice packet. (*Id*.)

To be considered timely, claim forms had to be postmarked on or before July 25, 2023.  (Doc. 89-2 ¶ 11.)  The parties have since agreed to continue accepting late claims, so long as the Class Member allocations do not exceed the 50% floor on distribution of the NSA required under the settlement agreement.  (*Id*.)  As of August 16, 2023, Atticus has received 899 Claim Forms,

1  814 of which have been deemed valid.  (*Id.*)  Nine of the remaining claims are invalid duplicate

2  submissions and 76 are under review; 64 class members submitted a dispute to challenge the

3  calendar weeks worked during the Class Period.  (*Id.*)  The disputes are currently under review.

4  (*Id.*)

5       Finally, Settlement Class Members had until July 25, 2023, to timely postmark a written

6  request for exclusion, or file an objection to the settlement.  (Doc. 89-2 ¶ 12.)  Atticus did not

7  receive any exclusion requests or objections to the settlement.  (*Id.*)

8       Considering the foregoing, the Court accepts the reports of the settlement administrator and

9  finds that Atticus provided adequate notice, thereby satisfying Federal Rule of Civil Procedure

10  23(e)(1).  *Silber*, 18 F.3d at 1453–54; *Winans*, 2016 WL 107574, at *3.

11       **B.       Final Fairness Determination**

12       At the final approval stage, the primary inquiry is whether the proposed settlement "is

13  fundamentally fair, adequate, and reasonable."  Fed. R. Civ. P. 23(e)(2); *Lane v. Facebook, Inc.*,

14  696 F.3d 811, 818 (9th Cir. 2012); *Hanlon*, 150 F.3d at 1026.  "It is the settlement taken as a whole,

15  rather than the individual component parts, that must be examined for overall fairness."  *Hanlon*,

16  150 F.3d at 1026 (citing *Officers for Justice v. Civil Serv. Comm'n of S.F.*, 688 F.2d 615, 628 (9th

17  Cir. 1982)); *see also Lane*, 696 F.3d at 818.  Having already completed a preliminary examination

18  of the agreement, the Court reviews it again, mindful that the law favors the compromise and

19  settlement of class action suits.  *See, e.g.*, *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir.

20  2008); *Churchill Vill.*, 361 F.3d at 576; *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th

21  Cir. 1992); *Officers for Justice*, 688 F.2d at 625.  Ultimately, "the decision to approve or reject a

22  settlement is committed to the sound discretion of the trial judge because [they are] exposed to the

23  litigants and their strategies, positions, and proof."  *Staton v. Boeing Co*, 327 F.3d 938, 953 (9th

24  Cir. 2003) (quoting *Hanlon*, 150 F.3d at 1026).

25       In assessing the fairness of a class action settlement, courts balance the following factors:

26       (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and
       likely duration of further litigation; (3) the risk of maintaining class action status

27       throughout the trial; (4) the amount offered in settlement; (5) the extent of
       discovery completed and the stage of the proceedings; (6) the experience and

28

views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Vill.*, 361 F.3d at 575; *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944 (9th Cir. 2015); *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 964-67 (9th Cir. 2009).  These settlement factors are non-exclusive, and each need not be discussed if they are irrelevant to a particular case.  *Churchill Vill.,* 361 F.3d at 576 n.7.

Consideration of the *Churchill* factors alone is not sufficient to survive appellate review. *See Briseño v. Henderson*, 998 F.3d 1014, 1022-26 (9th Cir. 2021) (holding that the revised Rule 23(e) requires district courts "to go beyond our precedent" and mandates consideration of "the *Bluetooth* factors" to all class action settlements, regardless of whether settlement was achieved before or after class certification); *see also* Fed. R. Civ. P. 23(e)(2)(C)-(D).  Under the revised Rule 23(e), "district courts must apply the *Bluetooth* factors to scrutinize fee arrangements . . . to determine if collusion may have led to class members being shortchanged."  *Briseño*, 998 F.3d at 1026.  The so-called *Bluetooth* factors—also referred to as "subtle signs" of collusion—include: (i) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;" (ii) the existence of a "clear sailing" arrangement, which provides "for the payment of attorneys' fees separate and apart from class funds," or a provision under which defendant agrees not to object to the attorney's fees sought; and (iii) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (internal quotations and citations omitted).  "The presence of these three signs is not a death knell— but when they exist, 'they require[] the district court to examine them, . . . develop the record to support its final approval decision,' and thereby 'assure itself that the fees awarded in the agreement were not unreasonably high.'"  *Kim v. Allison*, 8 F.4th 1170, 1180 (9th Cir. 2021) (quoting *Allen v. Bedolla*, 787 F.3d 1218, 1224 (9th Cir. 2015)).  Thus, while this Court has wide latitude to determine whether a settlement is substantively fair, it is held to a higher procedural standard, and in order "[t]o survive appellate review . . . [it] must show it has explored comprehensively all factors

and must give a reasoned response to all non-frivolous objections." *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 606 (9th Cir. 2021) (quoting *Allen*, 787 F.3d at 1223-24).

       1.   <u>Strength of Plaintiff's Case</u>

When assessing the strength of a plaintiff's case, the court does not reach "any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of th[e] litigation." *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1388 (D. Ariz. 1989). The court cannot reach such a conclusion because evidence has not been fully presented. *Id.* Instead, the court "evaluate[s] objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Id.*

As described in the motion for preliminary approval of the class settlement, the Ninth Circuit's recent decision in *Valiente v. Swift Transportation Co. of Arizona, LLC*, 54 F.4th 581, 586 (9th Cir. 2022), which held that the Federal Motor Carrier Safety Administration's "determination" preempting California's meal and rest break laws for drivers subject to certain federal regulation was retroactive, "completely eviscerated Plaintiff's second and third causes of action for violations of California's meal and rest break laws and, with it, nine years of potential liability. (Doc. 84 at 4, 5.) As a result, there has been a "fundamental[] change[] [in] the status of the action, as Plaintiff is left with only a claim for Defendant's alleged failure to pay separately for inspection time and detention time, which is subject to strong defenses based on the [the case of *Ayala v. U.S. Xpress Enterprises, Inc.*, 851 F. App'x. 53 (9th Cir. 2021), which concerned whether a 2020 decision by the California Supreme Court that "essentially eliminated minimum wage claims regarding piece-rate in the trucking industry"] and UCL and PAGA claims that were entirely based on the viability of the three causes of action." (*Id.*) Plaintiff asserts that he would not have been able to achieve the preliminarily approved settlement had *Valiente* been decided before settlement was reached. (Doc. 89 at 21.) Furthermore, as described in the Court's order granting preliminary approval of the proposed settlement, Plaintiff's PAGA claim is subject to the same risks as his Labor Code claims, discussed above, plus the additional risk that the Court could discount any penalties awarded at trial pursuant to Cal. Labor Code § 2699(e)(2). (Doc. 84 at 18, 20.)

In view of the foregoing, the Court finds that consideration of this factor weighs in favor

of granting final approval of the parties' settlement in this action.

        2.    <u>Risk, Expense, Complexity, and Likely Duration of Further Litigation, and Risk of Maintaining Class Action Status Throughout Trial</u>

The second and third *Churchill* factors, the risk, expense, complexity, and likely duration of further litigation, and the risk of maintaining class action status throughout trial, weigh in favor of approval.  *See* Fed. R. Civ. P. 23(e)(2)(C)(i).  "[T]here is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned."  *In re Syncor ERISA Litig.*, 516 F.3d at 1101 (citing *Class Plaintiffs*, 955 F.2d at 1276).  As a result, "[a]pproval of settlement is preferable to lengthy and expensive litigation with uncertain results."  *Johnson v. Shaffer*, No. 2:12-cv-1059-KJM-AC, 2016 WL 3027744, at *4 (E.D. Cal. May 27, 2016) (citing *Morales v. Stevco, Inc.*, No. 1:09-cv-00704-AWI-JLT, 2011 WL 5511767, at *10 (E.D. Cal. Nov. 10, 2011)).

Plaintiff contends that further litigation would increase risk and expense due to the above - described risks, as well as an additional risk that the class would be decertified.  (*See* Doc. 89 at 21.)  As identified by the Court in its certification order, California law may not apply to the currently certified class, which is comprised of non-resident drivers.  (*See* Doc. 35 at 10–11; Doc. 80-1 ¶ 26; *see also* Doc. 80 at 26–27.)

The Court finds that consideration of this factor weighs in favor of granting final approval.

        3.    <u>Amount Offered in Settlement</u>

To evaluate the fairness of the settlement award, the court should "compare the terms of the compromise with the likely rewards of litigation."  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968); *see also* Fed. R. Civ. P. 23(e)(2)(C)-(D).  "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not *per se* render the settlement inadequate or unfair."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).  To determine whether a settlement "falls within the range of possible approval," a court must focus on "substantive fairness and adequacy" and "consider plaintiffs' expected recovery balanced against the value of the settlement offer."  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007).  In addition, the court

9

1    must consider whether "the proposal treats class members equitably relative to each other" and

2    whether "the relief provided for the class is adequate."  Fed. R. Civ. P. 23(e)(2)(C)–(D).

3                    *a.*       *Gross settlement amount*

4            Under the settlement agreement, the parties have agreed to a $400,000 GSA allocated as

5    follows: (1) up to $100,000 (25% of the GSA) for attorney's fees and up to $20,000 for litigation

6    costs; (2) $10,000 incentive award for Plaintiff; (3) $20,000 in civil PAGA penalties, with $15,000

7    of the penalties payable to the California Labor and Workforce Development Agency ("LWDA");[1]

8    and (4) an estimated $29,558 in settlement administration costs.  (Doc. 89 at 8; Doc. 89-2 ¶ 14;

9    Doc. 89-6 at 6.)

10           Plaintiff estimates that the maximum potential damages as to the claims asserted in this

11   action are approximately $2,259,520, making the GSA of $400,000 GSA an approximately 17.7

12   percent of the full verdict value of Plaintiff's claims.  (Doc. 84 at 17–18; *see also* Doc. 80-1 at ¶¶

13   21–23.)  This settlement amount is within the range of the percentage recoveries that California

14   district courts—including this Court—have found to be reasonable.  *See, e.g., Singh v. Roadrunner*

15   *Intermodal Servs., LLC*, No. 1:15-cv-01497-DAD-BAM, 2018 WL 4382202 (E.D. Cal. Sept. 13,

16   2018) (approving a settlement of about 12% of the estimated maximum damages); *Glass v. UBS*

17   *Fin. Servs., Inc*., No. C-06-4068, 2007 WL 221862, at *4 (N.D. Cal. Jan. 26, 2007) (approving a

18   settlement of about 25–35% of the estimated maximum).  In addition, the Court notes that the

19   settlement distribution formula employed here is fair and reasonable because each Settlement Class

20   Member is allocated a payout that scales directly with their weeks worked, and any Class Member

21   may dispute the number of weekly hours attributed to them.  (*See* Doc. 89 at 16; Doc. 89-2 ¶¶ 10–

22   11, 15; Doc. 89-3 at 7; Doc. 89-6 at 38.)

23           According to the settlement administrator, the total calendar weeks worked by Class

24   Members during the Class Period ranged from one to 548, and the corresponding preliminary

25   payment amounts were between $0.52 to $284.66 for the 890 non-duplicative claims submitted.

26   (Doc. 89-2 ¶¶ 15–16.  Based on these amounts, the average award would have been $40.21.  (*Id.* ¶

27

28   ---
     [1] Pursuant to the PAGA, 75% of the civil PAGA penalties, or $15,000, will go to the LWDA, and 25%, or $5,000, will
     be allocated to the NSA.  (Doc. 89 at 8; Doc. 89-2 ¶ 14; Doc. 89-6 at 6.)  *See* Cal. Lab. Code § 2699(i).

16.)  However, because the settlement agreement provides that a minimum of 50% of the NSA shall be distributed to the class, the actual amounts received by those class members who have submitted valid claims will be substantially higher than these preliminary values.  (*Id.* ¶ 17.)  Indeed, assuming that no additional valid claims are submitted, the average individual settlement payment will be $127.61.[2]  (*Id.*)

As noted above, the Court has neither received objections to the settlement nor have any Class Members sought to opt out of the settlement.  Finally, the Court acknowledges that while "a larger award was theoretically possible, 'the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes'" *Barbosa v. Cargill Meat Sols. Corp*., 297 F.R.D. 431, 447 (E.D. Cal. 2013) (citing *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (internal citations and quotation marks omitted)).

Based on the information presented, the Court concludes that the amount offered in settlement of this action provides adequate relief for the class.

> *b.   PAGA penalties*

As described above, the settlement also provides for $20,000 in civil PAGA penalties.  (Doc. 89 at 8; 89-2 ¶ 14; Doc. 89-6 at 6.)  Pursuant to the PAGA, 75% of the civil penalties, or $15,000, will go to the LWDA, and 25%, or $5,000, will be distributed to aggrieved employees on a *pro rata* basis.[3]  (*Id.*)  *See* Cal. Lab. Code § 2699(i).

Although there is no binding authority setting forth the proper standard of review for PAGA settlements, California district courts "have applied a Rule 23-like standard, asking whether the settlement of the PAGA claims is fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes." *Haralson*, 383 F. Supp. 3d at 972 (internal quotation marks omitted).  This standard is derived principally from the LWDA itself.  In commenting on a proposed settlement

---

[2] The Parties have agreed that claims will be accepted as timely until the earlier of one week prior to the final approval hearing or the time at which 50% of the NSA has been claimed.  (Doc. 89-2 ¶ 17 n.2.)  The parties "do not expect the number of valid claims to change materially because only one or two additional claims are being received each week." (*Id.*)

[3] Under the PAGA, an "aggrieved employee" may bring an action for civil penalties for labor code violations on behalf of herself and other current or former employees.  Cal. Lab. Code § 2699(a).  An "aggrieved employee" is defined as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed."  *Id.* § 2699(c).

including both class action and PAGA claims, the LWDA offered the following guidance:

> It is thus important that when a PAGA claim is settled, the relief provided for under the PAGA be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, the court evaluate whether the settlement meets the standards of being "fundamentally fair, reasonable, and adequate" with reference to the public policies underlying the PAGA.

*O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) (citing the LWDA's guidance with approval).[4]  Recognizing the distinct issues presented by class actions, this Court is persuaded by the LWDA's reasoning in *O'Connor* and therefore adopts its proposed standard in evaluating the PAGA portion of the settlement now before the court.  *See, e.g., Castro v. Paragon Indus., Inc.*, No. 1:19-cv-00755-DAD-SKO, 2020 WL 1984240, at *6 (E.D. Cal. Apr. 27, 2020); *Patel v. Nike Retail Servs., Inc.*, No. 14-cv-04781-RS, 2019 WL 2029061, at *2 (N.D. Cal. May 8, 2019).  Accordingly, the Court will approve a settlement of PAGA claims upon a showing that the settlement terms (1) meet the statutory requirements set forth by the PAGA; and (2) are fundamentally fair, reasonable, and adequate in view of the PAGA's public policy goals.

When a proposed settlement involves overlapping class action and PAGA claims, courts may employ a "sliding scale" in determining if the proposed settlement is "fundamentally fair, reasonable, and adequate with reference to the public policies underlying the PAGA." *O'Connor*, 201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972 (following *O'Connor*); *McClure v. Brand Energy Serv.*, LLC, No. 2:18-cv-01726-KJM-AC, 2021 WL 2168149, at *10 (E.D. Cal. May 27, 2021) (same); *Cooks v. TNG GP*, No. 2:16-cv-01160-KJM-AC, 2020 WL 5535397, at *9–10 (E.D. Cal. Sept. 15, 2020) (same).  As the district court in *O'Connor* explained:

> For example, if the settlement for the Rule 23 class is robust, the purposes of PAGA may be concurrently fulfilled. By providing fair compensation to the class members as employees and substantial monetary relief, a settlement not only vindicates the rights of the class members as employees, but may have a deterrent effect upon the defendant employer and other employers, an objective of PAGA. Likewise, if the settlement resolves the important question of the status of workers as employees entitled to the protection of the Labor Code or contained substantial injunctive relief, this would support PAGA's interest in "augmenting the state's enforcement

---

[4] The LWDA has previously stated that it "is not aware of any existing case law establishing a specific benchmark for PAGA settlements, either on their own terms or in relation to the recovery on other claims in the action." *O'Connor v. Uber Techs., Inc.*, No. 3:13-cv-03826-EMC (N.D. Cal. Jul. 29, 2016).

capabilities, encouraging compliance with Labor Code provisions, and deterring noncompliance."

*Id.* at 1134–1135 (quoting the LWDA's guidance).  At the same time, where "the compensation to the class amounts is relatively modest when compared to the verdict value, the non-monetary relief is of limited benefit to the class, and the settlement does nothing to clarify [aggrieved workers' rights and obligations], the settlement of the non-PAGA claims does not substantially vindicate PAGA."  *Id.* at 1135.  Finally, "where plaintiffs bring a PAGA representative claim, they take on a special responsibility to their fellow aggrieved workers who are effectively bound by any judgment."  *Id.* at 1134.  Plaintiff's special responsibility to other aggrieved workers is especially significant because the "PAGA does not require class action procedures, such as notice and opt-out rights."  *Id.*  Thus,

> [t]he Court must be cognizant of the risk that despite this responsibility, there may be a temptation to include a PAGA claim in a lawsuit to be used merely as a bargaining chip, wherein the rights of individuals who may not even be members of the class and the public may be waived for little additional consideration in order to induce the employer to agree to a settlement with the class.

*Id.*

Plaintiff's counsel estimates a total of $1,807,470 in PAGA penalties in this action, which was discounted based on the fact that his PAGA claim is subject to the same risks as his Labor Code claims and the likelihood that this Court could exercise its discretion to reduce the amount of PAGA penalties ultimately awarded.  (*See* Doc. 84 at 19–20; Doc. 89 at 14.)  The resulting $20,000 civil penalty proposed by the settlement thus represents 5% of the $400,000 GSA.  The amount proposed to settle the PAGA claims is consistent with, and in fact exceeds, other PAGA settlements approved by this Court.  *See, e.g., Syed v. M-I, LLC*, No. 1:12-cv-01718-DAD-MJS, 2017 WL 714367, at *13 (E.D. Cal. Feb. 22, 2017) (approving PAGA penalties representing 1.4% of the gross settlement fund); *Garcia v. Gordon Trucking, Inc*., No. 1:10-cv-0324-AWI-SKO, 2012 WL 5364575, at *7 (E.D. Cal. Oct. 31, 2012) (approving PAGA penalties representing 0.27% of the gross settlement fund); *Castro*, 2020 WL 1984240, at *15 (approving PAGA penalties representing 2% of the gross settlement fund).

Moreover, in a declaration attached to Plaintiff's motion for preliminary approval, class counsel declared that the proposed settlement was submitted to the LWDA in accordance with PAGA, *see* Cal. Lab. Code § 2699(l)(2) (requiring that the proposed settlement be submitted to LWDA at the same time that it is submitted to the court).  (Doc. 80-1 ¶ 49; Doc. 80-5.)  The LWDA has not commented or objected to the settlement.  (Doc. 80-1 ¶ 50.  *See also* Doc. 84 at 19.)  Having reviewed the parties' submission and the terms of the proposed settlement, the Court finds that the settlement amount related to Plaintiff's PAGA claims is fair, reasonable, and adequate considering PAGA's public policy goals.  Thus, the Court finds that the amount offered in settlement of the PAGA claims here weighs in favor of final approval of the settlement.

### 4. Extent of Discovery Completed and Stage of the Proceedings

"In the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (quoting *In re Chicken Antitrust Litig.*, 669 F.2d 228, 241 (5th Cir. 1982)).  Approval of a class action settlement "is proper as long as discovery allowed the parties to form a clear view of the strengths and weaknesses of their cases." *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 454 (E.D. Cal. 2013).  A settlement is presumed fair if it "follow[s] sufficient discovery and genuine arms-length negotiation." *Adoma v. Univ. of Phx., Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012) (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004)).  The court must consider whether the process by which the parties arrived at their settlement is truly the product of arm's length bargaining and not collusion or fraud. *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).  These concerns are also reflected in Rule 23(e)(2)'s focus on procedural fairness—whether "the class representatives and class counsel have adequately represented the class" and whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(A)–(B).

Here, the Court is satisfied that the settlement was the result of genuine, informed, and arm's-length bargaining, as it was reached "following certification of the [c]lass on a contested class certification motion and a subsequent all-day private mediation conducted after counsel had

14

conducted sufficient an investigation to evaluate the strength and potential value of the class's substantive claims, as well as the likelihood of maintaining class certification of such claims through trial." (Doc. 89 at 26.)  As set forth in the order granting preliminary approval, the parties engaged in a private mediation with Mark S. Rudy, an experienced professional mediator, in June 2021. (Doc. 84 at 4; Doc. 89 at 12.)  The mediation took place after almost five years of litigation, and before the mediation, the parties "exchange[d] formal written discovery" and Plaintiff deposed Defendant's Fed. Civ. P. 30(b)(6) designee. (Doc. 84 at 2; Doc. 89 at 10–11.)  Defendant produced documents, including its written meal and rest period policies and other policies applicable to its truck drivers, "sample trip sheets," "Movement display data from the trucks' onboard computer systems," a sample "trip dispatch report," and a putative class list. (Doc. 84 at 2; Doc. 89 at 11.)  In addition, before participating in mediation, Plaintiff's counsel obtained from Defendant regarding the number of Class members and workweeks during the Class period. (Doc. 84 at 4; Doc. 89 at 12.)

For these reasons, the Court concludes that consideration of this factor weighs in favor of granting final approval.

### 5.   Experience and Views of Counsel

Co-class counsel Craig Ackermann and Julian Hammond submitted declarations describing their experience in class and representative action litigation, including wage and hour class actions in the trucking industry. (*See* Doc. 88-1 & Doc. 88-4.)  Both counsel represent that they have had extensive experience in labor and employment litigation, and have represented litigants in actions in both state and federal court, including employment litigation and wage and hour class actions. (*See* Doc. 88-1 at 3–4; Doc. 88-4 at 2–3.)  Class counsel has been previously approved as experienced class counsel by state and federal courts throughout California. (Doc. 88-1 at 3.)

The Court finds that class counsel's experience and views weigh in favor of granting final approval.

### 6.   Presence of a Governmental Participant

The Settlement Agreement contemplates payment of $20,000 in civil PAGA penalties to the LWDA under PAGA. (Doc. 89 at 8; 89-2 ¶ 14; Doc. 89-6 at 6.)  Because LWDA is a

governmental participant in the settlement, this too weighs in favor of approval of the settlement. *See Adoma*, 913 F. Supp. 2d at 977 (factoring civil PAGA penalties in favor of settlement approval); *Zamora v. Ryder Integrated Logistics, Inc.*, No. 3:13-cv-02679-CAB-BGS, 2014 WL 9872803, at *10 (S.D. Cal. Dec. 23, 2014) (same).

### 7.     Reaction of the Class Members

"It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 529 (citing cases). The presumption that a settlement is fair, reasonable, and adequate is particularly strong when there is an absence of a single objection to a proposed class action settlement. *See id.*; *Barcia v. Contain-A-Way, Inc.*, No. 3:07-cv-00938-IEG-JMA, 2009 WL 587844, at *4 (S.D. Cal. Mar. 6, 2009). Nevertheless, "[a] court may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it." *Cruz v. Sky Chefs, Inc.*, No. 4:12-cv-02705-DMR, 2014 WL 7247065, at *5 (N.D. Cal. Dec. 19, 2014) (citing *Churchill Vill.*, 361 F.3d at 577).

According to Plaintiff, no Class Member has filed an objection to the settlement pending final approval.  (Doc. 89-2 ¶ 12.  *See also* Doc. 89 at 9, 18.)  Accordingly, consideration of this factor weighs in favor of granting final approval.

### 8.     Subtle Signs of Collusion

The Court now turns to the *Bluetooth* factors to examine whether any "more subtle signs" of collusion recognized by the Ninth Circuit are present here.  *See Bluetooth*, 654 F.3d at 947.

#### a.     Whether there is disproportionate distribution to counsel

First, the Court does not find that class counsel is seeking a disproportionate distribution of the settlement.  With an average estimated Class Member recovery of $127.61 and a requested award of attorney's fees of $100,000, it does not appear that counsel seeks to receive a disproportionate distribution of the settlement. *See, e.g.*, *Morales*, 2011 WL 5511767, at *12 ("The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark.") (quoting *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000)); *Castro v. Paragon Indus., Inc.*, No. 1:19-CV-00755-DAD-SKO, 2021 WL

2042333, at *5, 12 (E.D. Cal. May 21, 2021) (granting final approval of a class action settlement with an average individual class member recovery of $1,070.62 and an award of $1,031,250.00 in attorney's fees).  Here, class counsel's request of $100,000 is 25% of the total settlement value, placing it well within the range that the Ninth Circuit has found acceptable.

> b.      *Existence of a "clear sailing" agreement*

Next, the Court considers the existence of a "clear sailing" agreement.  In general, a "clear sailing" provision is one in which the parties agree to the "payment of attorneys' fees separate and apart from class funds."  *Bluetooth*., 654 F.3d at 947.  However, the Ninth Circuit has recognized that a "clear sailing" arrangement exists when a defendant expressly agrees not to oppose an award of attorney's fees up to an agreed upon amount.  *Lane*, 696 F.3d at 832; *Bluetooth*, 654 F.3d at 947.

The settlement agreement provides that Defendant "will not object to Class Counsel's request from the Gross Settlement Amount of attorneys' fees not to exceed $100,000 (25% of the Gross Settlement Amount), and their reasonable costs up to $20,000 in addition to the attorneys' fees." (Doc. 89-6 at 10.)  Thus, the settlement includes a version of a "clear sailing agreement." Nevertheless, the existence of a clear sailing provision is not necessarily fatal to final approval.  *See Bluetooth*, 654 F.3d at 948; *see also In re Toys R Us-Delaware, Inc.–Fair and Accurate Credit Transactions Act (FACTA) Litig*., 295 F.R.D. 438, 458 (C.D. Cal. 2014) ("a clear sailing agreement is one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling").  Rather, "when confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class."  *Bluetooth*, 654 F.3d at 948 (citing *Staton*, 327 F.3d at 954).

As set forth more fully below, the Court determines the fees to be reasonable based on evidence submitted by class counsel.  *See, e.g., Singh v. Roadrunner Intermodal Servs. LLC*, No. 1:15-cv-01497-DAD-BAM, 2019 WL 316814, at *7–8 (E.D. Cal. Jan 24, 2019) (not finding collusion between the parties, despite a clear sailing agreement, where the fee award was analyzed and determined to be reasonable).  Moreover, the collusion concerns raised by the clear sailing provision are minimized, however, because the settlement agreement explicitly provides that

should the Court approve a fee award of less than 25% of the GSA, the difference "will be allocated the Net Settlement Amount" (Doc. 89-6 at 10–11.)  *See, e.g., Ferrell v. Buckingham Prop. Mgmt.,* No. 1:19-cv-00332-LJO-SAB, 2020 WL 291042, at *21 (E.D. Cal. Jan. 21, 2020).

### c.  Whether there is a reversion to the defendant

With respect to the reversion, the Ninth Circuit has counseled that "courts must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Bluetooth*, 654 F.3d at 947.  Here, the Court is satisfied that, with the 50 percent minimum distribution of the NSA, the notice process described above, and the lack of objections, the reversionary nature of the claims-made settlement militates against a finding of collusion.  *See, e.g., Davis v. Brown Shoe Co., Inc.,* No. 1:13-cv-01211-LJO-BAM, 2015 WL 6697929, at *6 (E.D. Cal. Nov. 3, 2015) (recommending final approval where defendant retained approximately 58% of the unclaimed funds as class members were adequately notified of retention of unclaimed funds and had opportunity to participate, and no objections were filed, citing four cases in the Eastern District of California where reversions were approved in amounts ranging from 45% to 75% of the net settlement funds).  *See also Nur v. Tatitlek Support Servs., Inc.,* No. 15-CV-00094-SVW (JPRx), 2016 WL 3039573, at *3 (C.D. Cal. Apr. 25, 2016) ("[C]laims-made settlements, with a reversion of unclaimed funds to the employer are routinely approved by the Ninth Circuit and Courts in California.") (collecting cases).  So too does the fact that the settlement was reached with the involvement of a mediator experienced in wage and hour actions.  *See, e.g., Garcia v. City of King City,* No. 14-CV-01126-BLF, 2017 WL 363257, at *9 (N.D. Cal. Jan. 25, 2017) (reversion approved in part because product of arm's length, non-collusive negotiations and assistance of magistrate judge in settlement negotiations); *Villegas v. J.P. Morgan Chase & Co.,* No. CV 09-00261 SBA (EMC), 2012 WL 5878390, at *6 (N.D. Cal. Nov. 21, 2012) (use of private mediator to facilitate settlement "tends to support the conclusion that the settlement process was not collusive.").

Considering the foregoing, the Court is satisfied that the more subtle signs of collusion noted in *Bluetooth* are not present here and finds that the settlement is fair, reasonable, and

adequate.  *See* Fed. R. Civ. P. 23(e).  Therefore, the Court will grant Plaintiff's motion for final approval of the parties' class action settlement.

## IV.   ATTORNEY'S FEES, COSTS, SERVICE AWARD, AND ADMINISTRATION EXPENSES

The motion for final approval of the settlement requests a service award to Plaintiff and settlement administration expenses to Atticus.  (*See* Doc. 89.)  As noted above, Plaintiff has also submitted a motion seeking attorney's fees and class counsel's litigation expenses.  (Doc. 88.)

### A.   Attorney's Fees

This Court has an "independent obligation to ensure that the award [of attorney's fees], like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941.  This is because, when fees are to be paid from a common fund, the relationship between the class members and class counsel "turns adversarial." *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010); *In re Wash. Pub. Power Supply Sys. Secs. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994).  As such, the district court assumes a fiduciary role for the class members in evaluating a request for an award of attorney's fees from the common fund.  *In re Mercury*, 618 F.3d at 994; *see also Rodriguez v. Disner*, 688 F.3d 645, 655 (9th Cir. 2012); *West Publ'g Corp.*, 563 F.3d at 968.

The Ninth Circuit has approved two methods for determining attorney's fees in such cases where the attorney's fee award is taken from the common fund set aside for the entire settlement: the "percentage of the fund" method and the "lodestar" method.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted).  The district court retains discretion in common fund cases to choose either method.  *Id.*; *Vu v. Fashion Inst. of Design & Merch.*, No. 2:14-cv-08822-SJO-EX, 2016 WL 6211308, at *5 (C.D. Cal. Mar. 22, 2016).  Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).  As noted above, the Ninth Circuit has generally set a 25% benchmark for the award of attorney's fees in common fund cases.  *Id.* at 1047-48; *see also Bluetooth*, 654 F.3d at 942 ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a

1   reasonable fee award, providing adequate explanation in the record of any 'special circumstances'

2   justifying a departure.").

3       Reasons to vary from the benchmark award may be found when counsel achieves

4   exceptional results for the class, undertakes "extremely risky" litigation, generates benefits for the

5   class beyond simply the cash settlement fund, or handles the case on a contingency basis.  *Vizcaino*,

6   290 F.3d at 1048-50; *see also In re Online DVD-Rental*, 779 F.3d at 954–55.  Ultimately, however,

7   "[s]election of the benchmark or any other rate must be supported by findings that take into account

8   all of the circumstances of the case."  *Vizcaino*, 290 F.3d at 1048.  The Ninth Circuit has approved

9   the use of the lodestar cross-check as a way of determining the reasonableness of a particular

10  percentage recovery of a common fund.  *Id.* at 1050 ("Where such investment is minimal, as in the

11  case of an early settlement, the lodestar calculation may convince a court that a lower percentage

12  is reasonable. Similarly, the lodestar calculation can be helpful in suggesting a higher percentage

13  when litigation has been protracted."); *see also In re Online DVD-Rental*, 779 F.3d at 955.

14      Here, the settlement provides that co-class counsel will seek an award of 25% of the GSA,

15  equivalent to $100,000.  (Doc. 89 at 8; Doc. 89-2 ¶ 14; Doc. 89-6 at 6, 10–11.)  The Court approved

16  Plaintiff's request for attorney's fees on a preliminary basis, finding that the requested fee was

17  reasonable and consistent with the benchmark rate in the Ninth Circuit (Doc. 84 at 27).  *See*

18  *Bluetooth*, 654 F.3d at 947.  The Court finds that a fee award of 25% of the GSA is reasonable for

19  several reasons.  First, the results obtained by class counsel in this case, which compensate the

20  Settlement Class Members at an average rate of $127.61 per class member weigh in favor of

21  approval.  (*See* Doc. 89-2 ¶ 16.)  This is particularly true given the considerable risk at the outset

22  of this case that class counsel would receive nothing, as described above.  *See  Jabbari v. Wells*

23  *Fargo & Co.*, No. 15-CV-02159-VC, 2018 WL 11024841, at *6 (N.D. Cal. June 14, 2018).

24      In addition, working on a contingent fee basis and undertaking the financial burdens of

25  prosecuting the action support that the reasonableness of the requested attorney's fees.  *See id.*

26  (considering, in approving fee award, the "considerable financial burdens that class counsel

27  shouldered on a contingent basis.").  The Ninth Circuit has recognized that counsel retained on a

28  contingency fee basis is entitled to a premium above their hourly rate to compensate for both the

1    risks and the delay in payment.  *See Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734 (9th Cir.

2    2016); *Stetson v. Grissom*, 821 F.3d 1157, 1166 (9th Cir. 2016).

3         The fee award requested in this case is also reasonable when compared to the prevailing

4    higher fees that have been awarded in other similar cases, including previous awards obtained from

5    this class counsel.  (*See* Doc. 88 at 19.)  The Court also notes the absence of any objection to the

6    settlement or requests for exclusions despite specific notice to the class regarding the amount of

7    attorney's fees counsel sought.  (Doc. 89 at 9, 18; Doc. 89-2 ¶¶ 8, 12.  *See also* Doc. 89-3.)  As

8    such, the Court finds the amount reasonable under the percentage of the fund method.

9         The Court next turns to the lodestar method to cross-check the reasonableness of the

10   requested attorney's fee award.  Where a lodestar is merely being used as a cross-check, the court

11   "may use a 'rough calculation of the lodestar.'"  *Bond v. Ferguson Enters., Inc.*, No. 1:09-cv-1662-

12   OWW-MJS, 2011 WL 2648879, at *12 (E.D. Cal. June 30, 2011) (quoting *Fernandez v. Victoria*

13   *Secret Stores, LLC*, No. 2:06-cv-04149-MMM-SHX, 2008 WL 8150856 (C.D. Cal. July 21, 2008)).

14   According to class counsel, the total lodestar amount is $339,135.12, which reflects 533.07 hours

15   expended by class counsel as of the date of the fee motion.[5]  (Doc. 88 at 20.)  In support of this

16   lodestar calculation, co-class counsel submitted an accounting of the hours they and their associates

17   billed, tasks completed, and applicable billing rates.  (*See* Doc. 88-2; Doc. 88-5.)  Co-class

18   counsels' firms are highly specialized in wage and hour matters and class action cases, and the

19   firms' hourly rates have been approved by several federal and state courts in California.  (Doc. 88-

20   1 ¶ 18; Doc. 88-4 ¶ 12.)

21        Based on co-class counsel's calculated lodestar figure, Plaintiff seeks a lodestar multiplier

22   of approximately 0.29—in other words, counsel seek less than one-third of what the lodestar cross-

23   check would indicate they are entitled.  In class actions, "[m]ultipliers can range from 2 to 4 or

24   even higher."  *Wershba v. Apple Computer, Inc*., 91 Cal. App. 4th 224, 255 (2001).[6]  "Indeed,

25   'courts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund

26

27   [5] The Court expresses no opinion as to the proper lodestar amount in this case.  *See, e.g., Flores v. Dart Container Corp.*, No. 2:19-cv-00083-WBS-JDP, 2021 WL 1985440, at *8 (E.D. Cal. May 18, 2021).

28   [6] Federal courts incorporate California state law on deciding an appropriate multiplier when the claims are brought under California state law.  *Vizcaino*, 290 F.3d at 1047.

cases." *Vizcaino*, 290 F.3d at 1051 (approving fee award where lodestar cross-check resulted in multiplier of 3.65); *see also id.* at 1052 n.6 (collecting cases and finding that risk multiplier fell between 1.0 and 4.0 in 83% of cases). *Accord In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding 3.97 multiplier and observing that "[i]n recent years multipliers of between 3 and 4.5 have become more common").

Factors considered in determining the appropriate lodestar multiplier generally include: (1) the risks presented by the contingent nature of the case; (2) the difficulty of the questions involved and the skill requisite to perform the legal service properly; (3) the nature of the opposition; (4) the preclusion of other employment by the attorney from accepting the case; and (5) the result obtained. *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001); *Graham v. DaimlerChrysler Corp.*, 34 Cal. 4th 553, 582 (2004); *Serrano v. Priest*, 20 Cal.3d 25, 48–49 (1977). Given the risks undertaken by counsel, the defenses likely to be raised by Defendant, the strong result for the class, and the fact that courts routinely approve fee awards corresponding with a lodestar of well over 1.0, the Court finds that a multiplier of 0.29 is justified in this case.

Accordingly, the Court concludes that the lodestar cross-check supports the requested award of $100,000 in attorney's fees, an amount equal to one-fourth of the GSA in this case.

### B.    Costs and Expenses of Class Counsel

Class counsel also seeks to recover the costs and expenses advanced while prosecuting this litigation. Such awards "should be limited to typical out-of-pocket expenses that are charged to a fee-paying client and should be reasonable and necessary." *In re Immune Response Secs. Litig.*, 497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007). These can include reimbursements for: "(1) meals, hotels, and transportation; (2) photocopies; (3) postage, telephone, and fax; (4) filing fees; (5) messenger and overnight delivery; (6) online legal research; (7) class action notices; (8) experts, consultants, and investigators; and (9) mediation fees." *Id.*

Here, class counsel requests reimbursement in the amount $13,289.31. (Doc. 88-1 ¶ 18; Doc. 88-3.) The Court has reviewed class counsel's declaration and its attached list of itemized expenses, and finds all the charges incurred to be reasonable. Accordingly, the Court will approve the reimbursement of costs and expenses in the amount requested.

### C.     Service Award

Courts frequently approve "service" or "incentive" awards in class action cases.  *West Publ'g Corp.*, 563 F.3d at 958–59.  Service awards recognize the effort of class representatives "for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general."  *Id.* at 958.  The district court evaluates each award individually, using "relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation."  *Staton*, 327 F.3d at 977 (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)).

Courts typically find an award of $5,000 to be presumptively reasonable.  *See, e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 457, 463 (9th Cir. 2000) (endorsing $5,000 service awards to named representatives); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 246 (N.D. Cal. 2015) (collecting cases); *In re Toys R. Us-Del., Inc. FACTA Litig.*, 295 F.R.D. 438, 470-72 (C.D. Cal. 2014) (awarding plaintiffs $5,000 each "consistent with the amount courts typically award as incentive payments").  Higher amounts can be appropriate, such as in employment actions, where a plaintiff risks retaliation or blacklisting as a result of suing their employer.  *See, e.g.*, *Buccellato v. AT&T Operations, Inc.*, No. 5:10-cv-00463-LHK, 2011 WL 4526673, at *4 (N.D. Cal. June 30, 2011).

Plaintiff seeks a service award of $10,000 for his services in this action.  (Doc. 89 at 8, 24.) Plaintiff contends this amount is fair and reasonable compensation because he has expended approximately 82 hours in connection with this case, including: participating in several lengthy interviews and phone conferences over a period lasting several months; searching for and producing a significant amount of relevant documents; reviewing pleadings in the case; consulting with counsel on factual issues; reviewing documents and data provided by Defendant; communicating about the case with Class Members; providing multiple declarations; reviewing and approving the mediation brief and settlement agreement; and participating in an all-day mediation.  (Doc. 80-5 ¶¶ 5–16.)  Plaintiff also notes that he undertook a significant reputational risk by suing Defendant.

1   (*Id*. at ¶ 19.)

2        Although the service award sought constitutes 2.5 percent of the GSA and is greater than

3   the amount typically awarded by courts in the Ninth Circuit, it is in line with amounts awarded in

4   similar circumstances. *See, e.g.*, *Castro*, 2021 WL 2042333, at *13 (granting $10,000 award for

5   70 hours of work over three years, reflecting 0.025% of the gross settlement amount); *Acosta v.*

6   *Evergreen Moneysource Mortg. Co.*, No. 2:17-cv-00466-KJM-DB, 2019 WL 6051117, at *18

7   (E.D. Cal. Nov. 15, 2019) (granting $10,000 award for 40 hours of work, reflecting 2.85% of the

8   gross settlement amount).

9        In view of the foregoing, and the lack of objection to the settlement, the Court finds that the

10  requested service payment of $10,000 is fair and reasonable and will be approved. *See Larson v.*

11  *Harman-Mgmt. Corp*., No. 1:16-cv-00219-DAD-SKO, 2020 WL 3402406, at *10 (E.D. Cal. June

12  19, 2020) (approving a $10,000 incentive payment where the named plaintiff "actively participated

13  in the litigation" and "no member of the class [] filed an objection to the settlement, despite the

14  notice informing the class that plaintiff Larson would seek a $10,000.00 inventive payment from

15  the common fund.").

16       **D.    Settlement Administration Expenses**

17       The Court previously approved the appointment of Atticus Administration, LLC ("Atticus")

18  as the settlement administrator for this action. (Doc. 35 at 8, 19–20; Doc. 84 at 28.) According to

19  the declaration of Bryn Bridley, the settlement administrator, the total cost for administration of

20  this settlement, including fees incurred and future costs for completion, is $29,558. (Doc. 89-2 ¶

21  18.) This estimate is consistent with, and in some cases lower than, other settlements submitted to

22  this court. *See, e.g*., *Lusk v. Five Guys Enterprises LLC,* No. 1:17-cv-00762-AWI-EPG, 2022 WL

23  4791923, at *9 (E.D. Cal. Sept. 30, 2022) (administration costs of $30,000 for a $1.2 million

24  settlement); *Razo v. AT&T Mobility Servs., LLC*, No. 1:20-cv-0172-JLT -HBK, 2022 WL 4586229,

25  at *17 (E.D. Cal. Sept. 29, 2022) (administration costs of $30,000 for a $575,000 settlement);

26  *Dakota Med., Inc. v. RehabCare Grp., Inc*., No. 1:14-cv-02081-DAD-BAM, 2017 WL 1398816, at

27  *5 (E.D. Cal. Apr. 19, 2017) (administration costs of $94,000 for a $25 million settlement); *Aguilar*

28  *v. Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 117789, at *7 (E.D. Cal. Jan.

11, 2017) (administration costs of $45,000 for a $4.5 million settlement).  The Court finds these administration costs reasonable and will direct payment in the requested amount.

## V.   CONCLUSION AND ORDER

Accordingly:

1. The hearing set for September 20, 2023, is VACATED;

2. The proposed class identified in the settlement agreement (Doc. 89-6) is certified for settlement purposes;

3. Plaintiff's motion for final approval of a class action settlement (Doc. 89) is GRANTED, and the Court approves the settlement as fair, reasonable, and adequate;

4. Named plaintiff Robert Martinez is confirmed as class representative; Plaintiff's counsel Ackermann & Tilajef, P.C. and HammondLaw, PC are confirmed as co-class counsel; and Atticus Administration, LLC is confirmed as the settlement administrator;

5. Plaintiff's motion for attorney's fees and costs (Doc. 88) is GRANTED;

6. The Court awards the following sums:

    a. Class counsel shall receive $100,000 in attorney's fees and $13,289.31 in expenses.  Class counsel shall not seek or obtain any other compensation or reimbursement from Defendant, Plaintiff, or Class Members;

    b. Plaintiff shall receive $10,000 as a service award;

    c. Atticus Administration, LLC shall receive $29,558 in settlement administration costs; and

    d. The parties shall direct payment of 75 percent of the settlement allocated to the PAGA payment, or $15,000, to the California Labor and Workforce Development Agency as required by California law, and the remainder of the PAGA payment, or $5,000, shall be distributed per the settlement agreement;

7. The parties are directed to effectuate all terms of the settlement agreement (Doc. 89-6) and any deadlines or procedures for distribution set forth therein;

8.      This action is dismissed with prejudice; and

9.      The Clerk of Court is directed to close this case.

IT IS SO ORDERED.

Dated:   __**September 8, 2023**__                    _____/s/ *Sheila K. Oberto*_____
                                                                      UNITED STATES MAGISTRATE JUDGE